[Crim. No. 5585.   Second Dist., Div. Three.   Aug. 8, 1956.]

THE PEOPLE, Respondent, v. DEANNA LYNN HEMBREE, Appellant.

John P. Brown for Appellant.

Edmund G. Brown, Attorney General, and Arthur L. Martin, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant Deanna Hembree was convicted of conspiracy to commit grand theft. Probation was granted on condition that she spend six months in the county jail. She appeals from the judgment and the order denying her motion for a new trial. She contends on appeal that the court erred: (1) in denying her motion for a continuance after a second amended information was filed; (2) in refusing to set aside the second amended information as to Count II; and (3) in instructing the jury.

In an information, filed October 18, 1955, Paul Weatherford, Bernard Madej and Deanna Hembree were charged with robbery in that they unlawfully took $600 from the person of Daniel Dowling by force and by putting him in

fear. It was alleged therein that Madej had been previously convicted of a felony. They were arraigned on that information. On November 30, 1955, an amended information was filed, wherein there was an additional allegation that Weatherford had been previously convicted of a felony. The ·defendants were arraigned on the amended information, and they pleaded not guilty. Weatherford and Madej, each, admitted the allegations as to his prior conviction.

Trial by jury, upon the amended information, was commenced on November 30, 1955. The trial proceeded on that day and on December 1; and after six prosecution witnesses had testified and after the prosecution had rested, and after one witness, called by defendant Hembree, had testified, the district attorney requested permission to file a second amended information charging defendants with conspiracy to commit grand theft, in Count I, and with assault with a deadly weapon, in Count II. (The overt act alleged with reference to conspiracy was that Deanna Hembree accompanied Daniel Dowling to the Topper Motel.) The requested permission was granted. Thereupon Weatherford and Madej were arraigned upon the second amended information, and they pleaded guilty to Count I and not guilty to Count II. The attorney for defendant Hembree requested at least a two-hour opportunity to draw up his own instructions ''on this.'' The judge said, ''I will give you the opportunity.'' When defendant Hembree was asked how she was pleading to Count I, her attorney said: ''We are not ready to plead as yet. We request a continuance in this matter for one week.'' The judge replied: ''We are not going to continue this case for one week with a jury hanging fire. We have a jury up in the room. That is absolutely unreasonable. If you insist upon time to plead, I will give you twenty-four hours but that is the limit.'' The attorney for defendant said: ''May we have ten minutes, ten more minutes?'' The judge did not reply thereto. Then, upon request of the attorney for Weatherford and Madej, the judge discharged the jury as to Count II insofar as Weatherford and Madej were concerned. (Later the judge dismissed Count II as to Weatherford and Madej—the count wherein the evidence was that Madej hit the victim on the head with a club.) The attorney for defendant Hembree requested that Weatherford and Madej be ordered to stay ''here'' to be called as defense witnesses. The judge did not make the order but suggested that the attorney for Hembree ''issue a subpoena for them

when we decide when we are going to go ahead. Right now you left the matter completely up in the air.'' Then the attorney for Hembree asked if he could have ten minutes. The judge said, ''We will take a fifteen-minute recess. That will give you time.'' The judge also said to him: ''Well, Mr. Brown [attorney for Hembree], would you be satisfied if I gave you a continuance until two o'clock to give you the opportunity to determine whether you want to plead at this time and also prepare your instructions?'' The attorney replied, ''Yes.'' Thereupon the jury returned to the courtroom and the judge stated to the jury: ''There has been a severance of the cases so that the case before you will be only as to the Defendant Hembree.'' The matter was continued (at 10:30 a. m.) until 2 o'clock.

At 2 o'clock the attorney for defendant Hembree made a motion that the second amended information be set aside on the ground that no probable cause was shown in the testimony at the preliminary hearing relative to Count II. The motion was denied. Said attorney also made a motion for a dismissal on the ground that there were material variations between the pleadings and the proof. The motion was denied. Then said attorney stated: ''I wish to move for a two-week continuance based on the fact that the defendant's constitutional rights to have adequate time to prepare his defense to a charge such as we have in this case——.'' Thereupon the judge said: ''Whereas here we have merely a difference of theory of guilt. The evidence is exactly the same under both theories. It must be assumed that defendant prepared to meet the evidence presented and that motion is also denied. That takes care of the motions then? Are you ready to proceed now, Counsel?'' The attorney for Hembree said: ''I can't in good conscience advise my client to plead guilty.'' The judge directed the deputy district attorney to arraign defendant Hembree. When he asked her how she was pleading to Count I, she said that she was not ready to plead. The judge directed the clerk to enter a plea of not guilty as to Count I. When the deputy district attorney asked her how she was pleading to Count II, she said that she was not ready to plead. The judge directed the clerk to enter a plea of not guilty to Count II, ''as the defendant has refused to enter a plea of guilty or not guilty.''

The trial then proceeded, and defendant Hembree was found guilty as to Count I and not guilty as to Count II. Her motion for a new trial was denied.

Appellant contends, as above stated, that the court erred in denying her motion for a continuance after the second amended information was filed. It will be necessary to state the substance of the evidence that had been presented at the time the second amended information was filed.

Daniel Dowling testified that on September 28, 1955, about 11:30 p.m., he was driving an automobile in Hollywood, and when he stopped at an intersection three girls were there, one of whom was defendant Hembree; the girls made a remark about his car; he replied that there is safety in numbers, and by his actions he invited them into the car; they got in the front seat of the car and he took them to three bars where they (including himself) had some "drinks"; at the last bar or restaurant he bought sandwiches and a pint of whiskey; he put the whiskey in the front seat of his car; the girls had told him that they were from "out of the state," were hungry and had no place to stay; something was said about going to a motel, and he took them to the Topper Motel; while he was in the office registering, the girls were in the car; thereafter he and the girls went into the motel room; he and defendant Hembree sat on one bed and two of the girls sat on the other bed; he took his coat off and opened the bottle of whiskey and took a sip; then he went to the office to get ice, and during that time he took $540 from his pocket and put it in his car; he kept about $27 in his pocket; when he returned to the room two of the girls (not including Hembree) went out to get cigarettes, and after a few seconds defendant Hembree followed them; about two or three minutes later the three girls returned and sat on a bed; about seven or eight minutes later (about 2 a.m.) there was a knock on the door, and when he opened the door the defendants Weatherford and Madej came in and both of them said, "What are you doing with our wives?" he (witness) told them that they could stay and he would get out, and that he was a deputy sheriff; then he opened the door and there was "a blinding flash" and that is all he remembered; when he recovered consciousness he was on an operating table, and at that time the $27 was gone. On cross-examination, he said that after he had taken a sip from the bottle and had left to get the ice he was not nauseated but he felt that he did not have control of his faculties; he thought that his feeling might have been caused by the sandwich, since there was something wrong with the sandwich; the whiskey which he drank from the bottle tasted "funny"; the first time that he noticed the whiskey

did not taste as it should taste was when he "took a sip" from the bottle (before going to get ice); he did not notice anything (about the taste of the whiskey) until he returned to the room after getting the ice; he did not remember examining his pocket for the loss of money; after he had been in the hospital, the $540 was still in his car.

Mr. Jestude testified that on said September 28, about 2 a.m., when he was driving by the Topper Motel, Officer Fedderson stopped him, got into his car and told him to follow the car which was ahead of him; they overtook that car on a dead-end street, and the officer required the occupants of the car to get out; two men and three girls got out; the men were defendants Weatherford and Madej, and one of the girls was defendant Hembree; then pursuant to direction of the officer, he (witness) went to the motel; he saw Dowling sitting on the bed in room four, with a blood-soaked towel upon his head; he also saw a roller (about 18 inches long and 2 inches in diameter—Exhibit 1) on the bed; the motel owner and his wife were in the room with Dowling.

Officer Fedderson testified that he saw defendant Hembree loitering in front of the motel; then he and another officer drove into the alley; then he saw Hembree on the second tier (or landing) of the motel with her shoe in her hand; after a couple of minutes two girls came walking in, and she motioned to them and they came back, went upstairs and conferred with her, and then all of them went down and entered room four; within a few minutes Weatherford and Madej walked into that room; thereafter, within two or three minutes, he (officer) heard a man scream, and then the five defendants ran out of the room, got into a car and drove away; he (officer) directed Mr. Jestude in the pursuit of the car; after apprehending the defendants he returned to room four and saw the roller, Exhibit 1; by that time the ambulance had taken Dowling away; he (officer) believed that the two other girls were turned over to the juvenile authorities.

Officer Warner, who was with Officer Fedderson, testified that he went into the motel room while Officer Fedderson was pursuing the five persons; before entering he tried to help Dowling who was lying on the walk in front of the room; he (witness) found the club (Exhibit 1) on the bed; he also saw whiskey there—it was "almost a full bottle of whiskey"; he did not take the whiskey as evidence. He also testified that, before the screaming, he had seen defendant Hembree alone

on the second landing of the motel, had seen the two other girls go into the motel from the street entrance, and had seen Hembree and the two other girls get together (on the second landing).

Officer Rikalo testified that he had a conversation with defendant Hembree, in the presence of Officer Moulder and the two other girls, Bobby Coolbaugh and Jean Weatherford; that Hembree said that: on September 27 she received a telephone call from Jean Weatherford (the wife of defendant Paul Weatherford) who asked her if she would like to make some money; a meeting was arranged to be held at Jean Weatherford's apartment; Bobby Coolbaugh was with her at the time of the telephone conversation, so they (Coolbaugh and Hembree) proceeded the next day to the Weatherford apartment where the two Weatherfords related a plan that the three girls (Jean Weatherford, Coolbaugh and Hembree) were to go to Hollywood where they would try to entice some man to join their company and then they were to administer to him a knockout-drop capsule which Paul Weatherford would give them; Hembree asked if it would kill a person, and upon being assured that it would only render a person unconscious, she listened to the rest of the story which was that when they had administered the capsule they were to take the man's money, or if he did not become unconscious, they were to telephone a number where Paul Weatherford and Madej would be waiting. In that conversation, she stated further that Paul Weatherford then gave a capsule to each girl; in the evening of that day Paul Weatherford and Madej took the three girls to Hollywood and left them there; while the girls were on the street, Dowling drove up in an automobile and called to them; they exchanged a few words, and he asked if they would like a drink; they got in the car and he took them to a club, and while they were there one of the girls placed a capsule in his drink; thereafter they went to another club and had another round of drinks; while the other girls were away from the table, Dowling tried to kiss Hembree; he bought sandwiches and liquor; thereafter he and the three girls went to the Topper Motel; while he apparently was registering at the motel, the girls were in the car; then all of them went into the motel room; Dowling removed his clothing; when Dowling left the room, the other two capsules were placed in the bottle of whiskey which was in the room; the other two girls left the room to get cigarettes; shortly thereafter Hembree left the motel (room); after the three

girls returned to the motel, defendant Paul Weatherford and Madej stepped into the motel and asked Dowling why he was with their wives; Dowling replied, "Well, I am a Deputy Sheriff and I am going after some reserves"; as Dowling started out the door Madej struck him with a club; then they (the two men and three girls) ran from the motel, jumped in an automobile and drove away. Officer Rikalo testified further, at some length, regarding a conversation which he had with Paul Weatherford in the presence of Madej and Officer Moulder. He also testified that, after that conversation, he (officer) asked Madej if the statement made by Weatherford was true, and Madej replied in the affirmative.

Thereupon the prosecution rested.

Defendant called Officer Fedderson as her witness, and he testified that he was present part of the time when Hembree made a statement to police officers at the police station, and that a stenographer was "taking down this statement at the time it was made"; he (officer) signed the statement as a witness; that he does not have the statement.

Thereupon, the deputy district attorney asked for, and received, permission to file the second amended information (hereinabove referred to). After a continuance from 10:30 a.m. to 2 p.m., the trial proceeded, as above stated, as to defendant Hembree upon the second amended information.

Defendant Hembree testified in substance as follows: On September 27 Jean Weatherford telephoned her, stated that she knew an easy way to make money, and asked her to come to her (Jean's) apartment. On September 28 she (Hembree) and Bobby Coolbaugh went to Jean's apartment, and Jean said that she and her husband (defendant Paul Weatherford) wanted Hembree and Coolbaugh to go to Hollywood with them, and that "we were supposed" to find a man who had money, take him to a bar and put a sleeping powder in his drink. Hembree and Coolbaugh left and returned there later that day. While they were there (after returning), Paul Weatherford and Madej came in and then Paul and Jean Weatherford and Madej went into the kitchen. Then Jean asked Hembree and Coolbaugh to come to the kitchen. Paul Weatherford showed them how to put the sleeping powder in a drink. Hembree did not say anything—she asked if the powder would hurt the man. Weatherford replied that it would not. All of them went in cars to a trailer court and the boys went into a trailer. When they returned, Paul Weatherford asked Hembree if she was scared. She replied, "Yes." He said,

"You better get some money or you know what will happen—I put a lot of money in this." She (Hembree) was scared. She "thought maybe" she should do what he told her or he might beat her up. She figured he would beat her up because she knew a girl he used to go with, and he used to beat her up all the time. Then all of them went to Hollywood. While the girls were walking on a street, Dowling drove up and asked them if they wanted a drink. He opened the car door and they got in the car. He took them to a bar where they had a drink. Then he took them to another bar where they had a drink. Then they went to a restaurant where he bought sandwiches and a pint of whiskey. Then they went to the Topper Motel. Dowling went to the rest room and came out in his shorts. He threw her (Hembree) on the bed, held her down and told her she was going to bed with him. During that time the other girls were laughing at her. She got up and went into the rest room and locked the door. The other girls knocked on the door and she let them in. She told the girls she wanted to get out of there (motel). They told her to return to the room. When she returned, Dowling put her on the bed again. The other girls said they were going to get cigarettes. She told them she wanted to go with them, but they told her to stay there. After the other girls had left, Dowling grabbed her. She got loose and ran out to the street. She was looking for the girls but when she saw a police car she went upon the second landing of the motel and waited for the girls. The girls came to the second landing and she told them that she was not going back and she wanted to get out of there. They told her she was going back or she would stay there by herself. She went back into the room with them, and at that time Dowling had his clothes on. Then Paul Weatherford and Madej came into the room and Weatherford said, "[Y]ou got my wife in here and she is only seventeen." Dowling said that he was a deputy sheriff and he was going to get help. He turned around, and Madej hit him on the head. Then they (three girls and the two boys) ran out, got into Weatherford's car and went away. The policeman followed them and arrested them. She was afraid of Paul Weatherford and Madej. She had no intention of putting something in anyone's drink. It was her intention just to go out—she thought it would be fun to go to Hollywood. Her intention changed when they showed those pills and said they (the girls) would have to go and put something in a drink. She got scared and was trying to think what she could do

so she would not have to do it. She threw her capsule away while they were going to the trailer.

On cross-examination Hembree testified in substance as follows: On the evening they went to Hollywood she dressed in a manner so that she would appear to be older. Jean Weatherford does a lot of joking, and when she told about the plan to make money Hembree thought she was joking. She (Hembree) was in favor of going to Hollywood, but she was not going to put sleeping powder in a drink. She did not indicate to Jean Weatherford that she disapproved of the idea. She did not think that the girls would use the pills. While Dowling was taking them to one of the bars, Coolbaugh put a capsule in a bottle of whiskey that Dowling had in his car. When they were at the motel, Coolbaugh and Jean Weatherford put a capsule in another bottle of whiskey. She did not agree to anything—she just went along. She started to go along with it, then she got scared and did not want to, and she told Coolbaugh and Jean Weatherford more than once that she did not want any part of it.

Section 1009 of the Penal Code provides: "An . . . information may be amended by the district attorney . . . without leave of court at any time before the defendant pleads. . . . The court in which the action is pending may . . . permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceeding . . . . The defendant shall be required to plead to such amendment . . . forthwith . . . and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination. . . ."

As above shown, the new charges of conspiracy and assault with a deadly weapon were made after the prosecution had rested and after one witness for the defense had testified. Prior to the filing of the new charges, the only charge was robbery. A detailed statement of the evidence, preceding the filing of the second amended information, has been made in order to show the status of the case when the original charge was abandoned during the presentation of the defense, and when the defendant was confronted with the requirement

of immediately presenting a defense against the new charges. Also a detailed statement of the evidence, following the filing of the second amended information, has been made in order to indicate the legal questions involved in presenting the defense and in instructing the jury under the new charges. It thus appears that at the time the second amended information was filed the evidence was not sufficient to prove robbery. There was no evidence that any property was taken from Dowling. (The original information did allege that $600 was taken, but he testified that he hid $540 in his car and that the $27 which he kept in his pocket was not in his pocket when he was on the operating table.) It is to be assumed, of course, that counsel for defendant limited his cross-examination of the prosecution witnesses to matters pertaining to robbery, and that in view of the lack of evidence as to robbery he did not cross-examine those witnesses to the extent that he might have if he had been defending under the new charges. The new charges involved additional issues as to an agreement, an overt act, withdrawal from conspiracy, mere association with conspirators, Hembree's fear of Paul Weatherford, and assault with a deadly weapon. It is apparent that a proper preparation for the defense in such a trial would require counsel for defendant to review the evidence which had been presented by the prosecution; to determine whether he should further cross-examine the prosecution witnesses; to review the law pertaining to the several new issues; to submit additional instructions; and to interview witnesses. A substantial amount of time would be required for such preparation. Also, an additional burden was placed on counsel for defendant (in his preparation for the defense) when the judge did not order that Weatherford and Madej remain in court as witnesses, but suggested that counsel for defendant subpoena them. When counsel for defendant first asked for a continuance, the judge said that if counsel insists on time to plead "I will give you twenty-four hours but that is the limit." When counsel for defendant again asked for a continuance (after the noon recess) based upon "the defendant's constitutional rights to have adequate time to prepare his defense," the judge said, "[W]e have merely a difference of theory of guilt. The evidence is exactly the same under both theories. It must be assumed that defendant prepared to meet the evidence presented and that motion is also denied." It seems that the judge considered that counsel for defendant, in not pleading immediately to the new charges

and in asking for a continuance, had "left the matter completely up in the air." ▮ It is to be remembered that it was the deputy district attorney who, by reason of his unpreparedness on the original charge, caused the belated second amended information to be filed and thereby created the situation which required further preparation by counsel for defendant. The amendment did not relate to a minor defect or insufficiency in the information, but it was an abandonment of the original charge and a substitution of two different offenses. As above shown, the defendant was arraigned on the new charges after she had started to present her defense to the original charge. If the arraignment had been the original arraignment the defendant would have been entitled to at least one day to plead. Section 990 of the Penal Code provides: "If on the arraignment, the defendant requires it, he must be allowed a reasonable time to answer, which shall be not less than one day for an offense originally triable in the superior court. . . ." Section 1009 of the Penal Code, above quoted, is inconsistent therewith in that section 1009 states that the defendant shall plead forthwith to the amended information. In the present case, however, no point is being made with reference to the pleading time allowed by the judge,—it appearing that counsel for defendant, in response to an inquiry by the judge, agreed that he would determine by 2 o'clock whether he wanted to plead "at this time." As above shown, at 2 o'clock, defendant was required to proceed with the trial immediately after the judge had ordered pleas of not guilty to be entered. Under the provisions of section 1009, after an amendment and plea thereto, "the trial . . . shall continue . . . unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted." In *People* v. *Sarazzawski*, 27 Cal.2d 7 [161 P.2d 934], it was said at page 17: "That counsel for a defendant has a right to reasonable opportunity to prepare for a trial is as fundamental as is the right to counsel." In view of the additional factual and legal issues involved under the new charges, and in view of the belated filing of the amendment, and in view of the fact that a substantial amount of time would be required for proper preparation for the defense after such an amendment, the court erred in refusing to grant a reasonable continuance. The allowance of three and one-half hours (from

10:30 a. m. to 2 p. m.) was unreasonable and an abuse of discretion. Defendant was denied a fair trial.

Another contention of appellant is that the court erred in instructing the jury with reference to conspiracy and her right to withdraw from the conspiracy. An instruction was given which stated in effect that a member of a conspiracy cannot escape responsibility by quietly withdrawing from the operations of the conspiracy; that such a member may withdraw from the conspiracy but to do so he must not only cease participation in the conspiracy but must give notice of his withdrawal to all other members of the conspiracy of whom he has knowledge. There was testimony to the effect that defendant Hembree notified the two other girls that she withdrew. Paul Weatherford and Madej were not available, prior to the assault, to be notified, and when they did arrive at the motel there was no opportunity to notify them before the assault; and there was testimony that Hembree was afraid of Paul Weatherford. The effect of the instruction, which was given, was that she could not withdraw without notifying all of them, even though it was impossible to notify some of them. There was no instruction as to whether her fear of Paul Weatherford was justification or excuse for not notifying him of her withdrawal. There was no instruction to the effect that evidence that a person who was in the company of conspirators is not, in itself, sufficient to prove that the person was a member of the conspiracy. In order to decide this contention of appellant, with respect to the instructions as to conspiracy and the right to withdraw, it would be necessary to quote and discuss several instructions. In view of the above conclusion regarding the denial of a continuance, it is not necessary to decide this contention.

Another contention of appellant is to the effect that the court erred in refusing to set aside Count II of the second amended information (charge of assault with a deadly weapon), since the transcript of the preliminary examination did not contain any evidence connecting appellant with an assault. In view of the above conclusion regarding the denial of a continuance, it is not necessary to decide this contention.

The judgment, and the order denying the motion for a new trial, are reversed.

Shinn, P. J., and Vallée, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 6, 1956.