[Crim. No. 5679. Fourth Dist., Div. Two. Dec. 11, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD R. MURPHY et al., Defendants and Appellants.

**COUNSEL**

Richard R. Murphy, in pro. per., Donahue, Katnik & Katnik and Arthur J. Donahue for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Harley D. Mayfield and Bernard A. Delaney, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KERRIGAN, Acting P. J.**—Murphy, an attorney, and Benware, an importer ("Appellants") were each convicted by a jury[1] of five counts of illegally offering and selling security shares in violation of a stock permit issued by the Commissioner of Corporations, a felony. (Corp. Code, § 25540.)

Appellants applied for probation. Their applications were granted. Murphy was sentenced to nine months in the Orange County jail on the five counts; the sentences were ordered to run concurrently; and the sentences were suspended for three years on condition Murphy pay a fine of $5,000 after the judgment became final. Benware was sentenced to six months in the county jail on the five counts; the sentences were ordered to run concurrently; and imposition of the sentences was suspended for three years on condition Benware pay a fine of $2,500 within six months after the judgment becomes final. The court further declared that the offenses were misdemeanors.

California Caduceus Company ("CCC") was incorporated in California in September 1968 by a group of doctors and the appellants. Their purpose was to enter the medical malpractice insurance field. Murphy performed the legal services necessary for incorporation. Murphy and Benware were two of the original corporate directors. Between November 1968-February 28, 1969, Murphy acted as attorney, secretary and director of CCC. He served as chairman of the board from March 1, 1969, to December 29, 1969. Benware was vice-president and director of CCC from December 1, 1968, to February 28, 1969, and from February 28, 1969 to December 29, 1969, was president and director.

---

[1]Murphy and Benware were acquitted of one count of conspiracy to commit grand theft (Pen. Code, §§ 182, subd. 1, 484, 487) and three counts of grand theft (Pen. Code, §§ 484, 487). These four counts charged embezzlement of corporate funds.

To gain a foothold in the malpractice insurance industry, CCC's directors decided in November 1968 to purchase an 88½ percent interest in Casualty Insurance Company of California ("Casualty") for $946,000. The acquisition was payable as follows: $100,000 on December 11, 1968, $15,000 on December 15, 1968, $235,000 on December 31, 1968 and the $596,000 balance on January 31, 1969.[2] To finance the Casualty purchase, CCC's directors authorized Murphy to file an application for a permit to sell and issue 459 shares of CCC stock: 153 were to be sold for $1,000 per share; the remaining shares were to be sold to the initial shareholders for $1,000 per share on a 2-1 option basis.

Effective January 2, 1969, the Commissioner of Corporations issued an amended permit authorizing the sale and issuance of CCC securities to *medical doctors, dentists and pharmacists having a net worth of $50,000 exclusive of home, car and furnishings and to attorneys.*

On June 2, 1969, the Commissioner of Corporations received an application for a curative permit from CCC. This application indicated that CCC shares had been sold to persons other than those designated in the January 2, 1969 amended permit. The application for the curative permit had been authorized by the CCC board of directors. Appellants were two of these directors. When it came to the commissioner's attention that CCC had violated the conditions of the amended permit effective January 2, 1969, the curative permit was never granted. To the contrary, criminal indictments were handed down against the appellants.

It is undisputed that CCC shares were sold to five purchasers, none of whom were medical doctors, dentists, pharmacists or attorneys. The five counts of which appellants were convicted show the following sales: (1) five shares ($5,000) to a trenching contractor; (2) five shares ($5,000) to a building contractor; (3) five shares ($5,000) to a teacher; (4) one share ($1,000) to a postal clerk; and (5) five shares ($5,000) to an airline pilot.

Evidence was introduced to the effect that none of the purchasers were ever queried about their respective occupations and none were advised as to any restrictions on the sale of the stock. Similarly, no inquiries were made as to the net worth of the purchasers. The certificates evidencing the shares were signed by both appellants.

CCC's certified public accountant testified that both appellants were

---

[2]These periodic payments were later modified.

present at board meetings at which the conditions and provisions of the amended permit were specifically discussed.

Appellants both admitted at trial that their signatures appeared on the stock certificates. Murphy testified he was familiar with the provisions of the amended permit and that he knew that at least three of the proposed purchasers were not doctors, dentists, pharmacists or attorneys.

During the course of an 11-week trial, the appellants took the position that they sold the shares in good faith in order to acquire sufficient funds to complete CCC's acquisition of Casualty and that their efforts in negotiating the sale of the stock were to save CCC's assets from being plundered by a conspiratorial group composed of Congressman John Schmitz, financier C. Arnholt Smith, the California Corporations Commissioner and the California Insurance Commissioner, all of whom were engaged in a plot either to destroy CCC or to take over its assets for themselves.

Multiple issues are raised on appeal. In substance, appellants maintain that their convictions resulted from serious errors committed by the trial court, the prosecutor, and the jury. These issues will be considered in categorical order.

## Trial Continuance

Appellants were indicted in December 1970. The case was scheduled for trial on November 22, 1971. Initially, Murphy and Benware were represented by attorney Donahue. However, in August 1971, a purported conflict-in-interest arose between appellants, and Murphy began representing himself with attorney Donahue continuing to represent Benware. On November 5, 1971, attorney Donahue requested a continuance of the scheduled trial date of November 22 and the motion was denied by Judge Murray. On November 22, when the presiding judge called the matter for trial, appellants again moved for a continuance of the trial and the presiding judge denied the motion and the case was assigned to Judge Van Tatenhove. When appellants appeared in Judge Van Tatenhove's court, they renewed their motion for a continuance on the ground that Murphy desired to secure private counsel and that attorney Aronson might undertake representation upon Murphy's behalf but would need 60-90 days in order to prepare for trial.

Judge Van Tatenhove allowed the parties to argue the matter extensively. The district attorney opposed a continuance on the grounds that there had been numerous continuances of pretrial matters since the return of the indictments 11 months earlier; that Murphy had discovered the

purported conflict during the summer months and had at least 90 days or more to obtain counsel; that attorney Aronson's affidavit indicated that he would require at least 30 days to determine whether he would be willing to undertake representation of Murphy; and that the prosecution had subpoenaed a large number of witnesses and was ready for trial.

The trial judge denied the motion on the grounds that Murphy had not been diligent in his efforts to obtain counsel; that any further delay would be disruptive of the efficient administration of justice; and that it was merely speculative whether attorney Aronson would even enter the case.

Appellants argue that Murphy was denied his right to counsel and that the trial court abused its discretion in denying the motion.

In criminal prosecutions, the accused shall have the right to appear and defend in person and with counsel. (Cal. Const., art. I, § 13.) A defendant who is himself a lawyer enjoys the right to counsel. (*People* v. *Napthaly,* 105 Cal. 641, 645 [39 P. 29]; *Bogart* v. *Superior Court,* 60 Cal.2d 436, 440 [34 Cal.Rptr. 850, 386 P.2d 474].)

"A defendant has no absolute right to be represented by a particular attorney; however, the courts should make a reasonable effort to insure that a defendant financially able to retain an attorney of his own choice can be represented by that attorney. [Citation.] A defendant's desire to be represented by counsel of his own choice can constitutionally be forced to yield only where it will result in significant prejudice to the defendant himself, or in a disruption of the ordinary process of justice unreasonable under the circumstances of the particular case. [Citation.] The burden is on the defendant to establish an abuse of discretion in denying his request for a change of counsel and, unless there has been a miscarriage of justice, a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power. [Citation.] [¶] The matter of continuance to obtain counsel is traditionally within the discretion of the trial court, and it is not every denial of a request for more time that violates due process even if the party . . . is compelled to defend without counsel; . . . Due process is not denied every defendant who is refused the right to defend himself by means of his chosen retained counsel; other factors, including the speedy disposition of criminal charges, demand recognition, particularly where defendant is inexcusably dilatory in securing legal representation. [Citation.]" (*People* v. *Brady,* 275 Cal.App.2d 984, 992-993 [80 Cal.Rptr. 418]; see also *People* v. *Johnson,* 5 Cal.App.3d 851, 858 [85 Cal.Rptr. 485]; *People* v. *Byoune,* 65 Cal.2d 345, 346 [54 Cal.Rptr. 749, 420 P.2d 221].) The right to counsel may not be used to subvert the

orderly administration of justice and its utilization as a tool for dilatory purposes may not be permitted. (*People* v. *Douglas,* 61 Cal.2d 430, 435 [38 Cal.Rptr. 884, 392 P.2d 964].)

■ Murphy had over 11 months between the date of the indictment and the trial date to make arrangements for counsel. Moreover, his request for a continuance to obtain private counsel had previously been denied. Nevertheless the trial judge allowed him to renew the motion and exercised sound discretion in denying it. Murphy knew in August that attorney Donahue would represent Benware only and that the district attorney's office would oppose any request for a continuance. There was no assurance that attorney Aronson would undertake the case in his behalf. Witnesses were under subpoena and the prosecution was ready to proceed to trial. Not only did the trial judge act properly in denying the motion for continuance but the record indicates that Murphy was very effective in representing himself[3] and that he and attorney Donahue constituted highly capable advocates on behalf of the defense.

### Change of Venue

■ On the trial date of November 22, 1971, defendants made a motion for change of venue before the presiding judge. The matter was referred to the trial judge. Murphy filed a 21-page affidavit in support of the motion. In essence, the appellants claimed that they could not get a fair trial in Orange County because financier Smith and Congressman Schmitz had entered into a conspiracy to destroy or plunder CCC for malicious reasons or for the purpose of taking over the assets of CCC in an endeavor to enter the medical malpractice insurance business themselves and that Schmitz and Smith exerted such power and influence in the county as to deprive appellants of the right to a fair trial.

Murphy's affidavit contained the following historical background: He had been Schmitz' campaign manager when Schmitz was elected state senator; Schmitz later became a bitter enemy of Murphy; Schmitz had undertaken to discredit Murphy; Schmitz "teamed up" with Smith and they utilized their joint political power to destroy CCC; Smith provided the money and the organization to elect Schmitz to Congress; Smith took over

---

[3]Following the jury verdicts, appellants made a motion for a new trial. In support of the motion, Murphy filed a declaration indicating that he had tried nearly 300 criminal cases. In denying the motion for a new trial, the trial court also commented that there was no evidence of a conflict of interest between Murphy and Benware and that the only reason for this so-called "conflict" was to delay the trial. An accused cannot subvert the orderly and efficient administration of justice by dilatory tactics. (*People* v. *Douglas, supra,* 61 Cal.2d 430, 435.)

Casualty Insurance Company after destroying CCC; their "string pulling" would somehow deny the appellants the right of a fair and impartial jury.

In denying the change of venue motion, the court noted that there were three grounds for the motion: newspaper publicity; Smith's influence; and Schmitz' influence.

The judge commented that there had been newspaper coverage of the case only at the time the indictments were handed down; that he had never heard of C. Arnholt Smith and that the average juror probably had not either (although he assumed Smith was well known in business and financial circles); that there had been no proof that Schmitz had any influence over any of the prospective jurors; and there was no indication that Schmitz would be a witness in the case or connected with the case in any manner.

■ A change of venue must be granted where the defendant shows a reasonable likelihood a fair trial cannot be had in the forum. (*Frazier* v. *Superior Court,* 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694].) It is the duty of the reviewing court to make an independent evaluation of the circumstances to satisfy itself that the defendant has obtained a fair trial. (*People* v. *Tidwell,* 3 Cal.3d 62, 68 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court,* 68 Cal.2d 375, 382 [66 Cal.Rptr. 724, 438 P.2d 372].)

■ There is no showing that this was a celebrated case or was of a brutal nature or that the victims were popular citizens in the community. The criminal acts took place in a large metropolitan area, not a small rural community. The average person was not aware of the facts of this case. Consequently, the trial court did not err in concluding there was a reasonable likelihood the defendants could get a fair trial in Orange County and denial of their venue motion was proper.

ORANGE COUNTY JURY PANEL

■ On the date set for trial, Murphy made a motion before the presiding judge to set aside the jury panel. The hearing on the motion was assigned to the trial judge. In support of the motion, Murphy filed a declaration to the following effect: In Orange County, there is only a random mailing of the affidavit for jury service forms for those selected; only 30-60 percent return the affidavit; only those returning the affidavit are summoned for jury duty; the jury commissioner is very permissive in allowing businessmen and civic leaders to be excused; wage earners are also excused; the jury commissioner's practice of routinely excusing businessmen, com-

munity leaders and wage earners amounts to a systematic exclusion of a segment of the community, and, therefore, the Orange County jury panels are not representative of the community-at-large.

Murphy also called the Orange County Assistant Superior Court Administrator and Jury Commissioner as a witness. He testified as follows: The first step in the jury selection procedure consists of a random computer selection of one in every seven registered voters; the period of jury service is two calendar months; the number of prospective jurors so selected was 77,538 at that time; the second step is the mailing of an affidavit for jury service form to all those persons initially selected; the form is returned to the commissioner's office; most forms are returned within 60 days; no action is taken to follow-up on nonresponses; following return of the affidavits, another random selection is conducted to obtain the reduced number of prospective jurors actually needed at the time; a summons is then dispatched by the sheriff to those selected; exemptions are monitored and honored or rejected by the jury commissioner's office in accordance with section 200 of the Code of Civil Procedure and excuses are honored or rejected in accordance with section 201 of the code; no follow-up work is done as to nonresponses inasmuch as a summons would have to be issued to each nonresponder and even if this laborious process was followed, an order to show cause would have to be issued and a hearing conducted; this would be time-consuming and expensive.

At the conclusion of the hearing, the trial court denied the motion to set aside the jury panel.

Appellant Murphy maintains that Orange County jury panels are devoid of private businessmen or community leaders and anyone who chooses not to respond to a mailing and that this constitutes a systematic exclusion of jurors in violation of both the United States and California Constitutions.

■ The American tradition of trial by jury contemplates an impartial jury drawn from a cross-section of the community; this does not mean that every jury must contain representatives of all the economic, social, religious, racial, political or geographical groups of the community; frequently such complete representation would be impossible; but it does mean that prospective jurors shall be selected by court officials without *systematic* and *intentional exclusion* of any of these groups; recognition must be given to the fact that those eligible for jury selection shall be found in every stratum of society; jury competence is an individual rather than a group or class matter; that fact lies at the very heart of the jury system; to disregard it is to open the door to class distinctions and discriminations which

are abhorrent to the democratic ideals of trial by jury. (*Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 220 [90 L.Ed. 1181, 1184, 66 S.Ct. 984, 985, 166 A.L.R. 1412].) ■ However, random selection from the voter registration list provided by the registrar of voters is a proper method of selecting juries. (*People* v. *McDowell*, 27 Cal.App.3d 864, 870-871 [104 Cal. Rptr. 181].) Absent a showing that use of a voter registration list results in the systematic exclusion of a cognizant group or class of qualified citizens, such list may be used as the sole source for jury selection. (*People* v. *Sirhan*, 7 Cal.3d 710, 749-750 [102 Cal.Rptr. 385, 497 P.2d 1121].) The burden is on appellant to demonstrate that the voter rolls of a county do not fairly reflect a cross-section of the community. (*People* v. *McDowell*, *supra*, 27 Cal.App.3d 864, 870.)

■ Murphy did not establish that the voter registration rolls of Orange County do not fairly reflect a cross-section of the community. (See *People* v. *McDowell*, *supra*, 27 Cal.App.3d 864, 870; *People* v. *Gibbs*, 12 Cal.App.3d 526 [90 Cal.Rptr. 866].) In short, there was no proof of any systematic exclusion of businessmen or wage earners. The mere fact that some prospective jurors failed to answer the questionnaire does not indicate any deliberate practice on the part of county officials to exclude any eligible voter from jury service. Consequently, the trial court properly denied the motion to set aside the Orange County jury panel.

### MOTION FOR MID-TRIAL CONTINUANCE

At the beginning of the trial, the court and counsel informed the jury that the trial would be a long one and would go into the "Holiday Season." At the outset, attorney Donahue made a motion to continue the trial beyond the holidays because of the difficulty in selecting a jury which would be willing to serve during the holiday season. The court denied the motion for continuance but questions were propounded to the prospective jurors whether there was any hardship they would have to undergo by reason of having to serve during the holidays.

Appellants claim that they were unable to get a fair and impartial jury because the continuance was denied.

Section 1050 of the Penal Code provides in part that "The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time, and it shall be the duty of all courts and judicial officers and of all prosecuting attorneys to expedite such proceedings to the greatest degree that is consistent with the ends of justice. . . . No continuance

of a criminal trial should be granted except upon affirmative proof in open court, upon reasonable notice, that the ends of justice require a continuance. . . ."

The determination as to whether the accused has affirmatively demonstrated that justice requires a continuance is a factual matter and in the absence of an abuse of discretion, a trial court's determination will not be disturbed on appeal. (*People* v. *Bethea,* 18 Cal.App.3d 930, 937 [96 Cal.Rptr. 229]; *People* v. *Johnson, supra,* 5 Cal.App.3d 851, 859.)

Here, the reasons advanced for a continuance were entirely speculative, especially in view of the *voir dire* procedure employed by the trial judge to discover and excuse any potential juror who conscientiously felt he would be unable to sit on a lengthy case which would extend through the holiday season.

### PUBLIC DEFENDER—BENWARE

On November 29, 1971, Benware made a motion to relieve attorney Donahue as his counsel and requested the appointment of the public defender or, in the alternative, that attorney Donahue be compensated out of county funds pursuant to section 987.2 of the Penal Code. A hearing was held in chambers and Benware made the following representations to the court: He and Murphy originally agreed to pay Donahue $20,000 if the case went to trial; each was to be responsible for one-half of the fee; he had paid Donahue $800 of his $10,000 share prior to trial; two days before the trial commenced, a keeper had been placed in his business and his business was closed; all of his assets had been lost and he was unable to pay Donahue.

Donahue stated that Benware had paid him $800; that Benware had no funds to pay the balance due him; that due to his own office and family expenses, he could not afford to undertake the burden of defending Benware for only $800.

The court denied the motion to relieve Donahue or to pay him from public funds. In doing so, the court commented that granting of the motion to appoint the public defender would necessitate a continuance and that the elements of justice required a speedy trial and that a year had transpired since the indictments were handed down. The court further commented that once an attorney undertakes to represent a client for a fee, he has a duty to represent the accused unless he moves to be relieved a reasonable time before the trial date.

Turning to the propriety of the court's ruling, it should be preliminarily noted that it is extremely doubtful whether Murphy or Benware have any standing to question the court's ruling. Murphy certainly cannot complain as he was not represented by Donahue at the trial. Benware was accorded superior representation and therefore only Donahue was harmed, if at all, by the court's ruling and Donahue is obviously not a party to the appeal.

Even assuming that the parties have standing to raise the issue, this motion was simply not timely made. Therefore, the trial court cannot be accused of abuse of discretion. This is far different from a situation where a motion to withdraw counsel is timely made before the case is set for trial and where there is no showing that withdrawal would prejudice the defendant, the prosecution or the smooth course of the administration of justice. (*People* v. *Prince,* 268 Cal.App.2d 398, 406 [74 Cal.Rptr. 197].) Having undertaken the defense of a criminal case, an attorney must continue with his services until he is released by the client or by the court; he may apply to the court for release from further service and for good cause shown may be released, but he may not abandon his representation at will, nor for considerations personal to himself. (*People* v. *Massey,* 137 Cal.App.2d 623, 626 [290 P.2d 906].)

### Public Defender—Murphy

Murphy maintains it was prejudicial error for the court not to appoint a public defender for him. Murphy made a motion before the jury was sworn for the appointment of a public defender on the grounds that he was financially unable to employ counsel and had not waived his right to an attorney. In support of his motion, he filed an affidavit of financial inability to employ counsel containing averments to the effect that he was the target of several lawsuits involving millions of dollars and his professional and personal expenses were burdensome and his income only nominal. The trial court denied the motion. In doing so, the judge referred to his earlier ruling denying a similar request by Benware and stated that his reasons for denying Murphy's motion were based on similar grounds. In denying Benware's motion, the court made it clear that if it relieved attorney Donahue and appointed the public defender, it would necessitate a lengthy continuance and thus interfere with the efficient administration of justice. The same result would have obtained if the court had granted Murphy's motion. The trial court's ruling was proper for the same reasons previously cited in connection with Murphy's claim that he was denied his right to counsel.

## Amendment of the Indictment

On December 1, 1971, nine days after the beginning of the trial, the court granted the prosecution's motion to amend the five counts of the indictment (counts V through IX inclusive) relating to the charges of violating the Corporate Securities Law. The five counts related to five different offerings or sales involving five different buyers. Both the original indictment and the indictment, as amended, related to the same offerings and sales and the same five persons. For example, count V reads as follows:

"COUNT V: The Grand Jury of the County of Orange, State of California, by this fifth count of this Indictment, hereby further accuses RICHARD R. MURPHY and RALPH K. BENWARE of a Felony, to-wit: Violation of Section 25540 of the Corporations Code of the State of California, in that on or about the 29th day of August, 1969, in the County of Orange, State of California, the said RICHARD R. MURPHY and RALPH K. BENWARE did willfully, unlawfully and feloniously offer for sale and sell a security, to-wit:
Caduceus (LVT)*
shares in California ~~Cadensus~~ Company, to Arthur B. Bordley and Elizabeth E. Bordley, [the airline pilot and his wife] which sales was [sic] in violation of the permit issued by the Commissioner of Corporations, ~~as provided in Section 25110 of the Corporations Code of the State of California.~~" (LVT)*

The amendment of each count consisted mainly of excising the following words from the last sentence of the count, to wit: "as provided in Section 25110 of the Corporations Code of the State of California."

When the court indicated it intended to allow the amendment, appellants made a motion for a continuance on the ground that the deletion constituted a material amendment to the indictment and would require more time to prepare a proper defense to the indictment as amended. The motion for continuance was denied.

■ Appellants now claim it was prejudicial error to deny their motion for a 120-day continuance.

A trial court may order an amendment to a criminal proceeding upon the application of the district attorney, and the defendants shall be re-

*LVT are the trial judge's initials.

quired to plead to such amendment or amended pleading forthwith; and the trial shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. (Pen. Code, § 1009.) If a substantial change in the pleadings is ordered so as to require additional time for preparation to defend the cause, it may be reversible error to deny a continuance. (*People* v. *Murphy,* 59 Cal.2d 818, 825 [31 Cal. Rptr. 306, 382 P.2d 346]; *People* v. *Hembree,* 143 Cal.App.2d 733, 743 [229 P.2d 1043].) For example, where the original charge is robbery and the prosecution wants leave to charge another crime, to wit, conspiracy to commit grand theft and assault with a deadly weapon, a request for continuance should not be denied. (*People* v. *Hembree, supra,* 143 Cal. App.2d 733.)

However, the amendment herein merely consisted of striking certain language as surplusage. It was not a material change nor did it charge a new and different offense. In effect, the defendants were charged with the same offenses arising out of the same transactions as those originally charged. Therefore, the motion allowing the amendment was in the discretion of the trial court. (*People* v. *Massie,* 241 Cal.App.2d 812, 819 [51 Cal.Rptr. 18].) Similarly, denial of the continuance would not require reversal, absent a clear abuse of discretion showing prejudice. (*People* v. *Hernandez,* 242 Cal.App.2d 351, 355 [51 Cal.Rptr. 385].) Inasmuch as the amendment here did not amount to any change in the charges or the victims, the trial court acted properly in authorizing the amendment and denying the continuance.

### EXCLUSION OF EVIDENCE

 Fifteen pages of appellants' briefs are devoted to the argument that the trial court committed prejudicial error in excluding certain relevant defense evidence. Without reciting each piece of evidence which appellants claim is relevant and admissible, suffice it to say that much of the argument is totally unsupported by the record. Some of the "evidence" was apparently referred to in Murphy's opening argument and the record of his statement is not before us.

In any event, the substance of the evidence which the appellants claim was improperly excluded related to the history of the formation and development of CCC. The company was apparently plagued with financial problems during its entire existence. The main source of its trouble was financing. Its officers and directors had to get sufficient funds in order to

enable CCC to acquire control of Casualty. This necessitated the sale of CCC shares. Appellants blame the failure of CCC on the Schmitz-Smith conspiracy. They also claim that several officials and employees of the Corporation Commissioner's office and the Department of Insurance, and state judges, one federal judge and others were engaged in the plot to destroy CCC. However, the motives of the purported conspirators and the evidence of the proxy fights within CCC had nothing whatsoever to do with the criminal charges facing the appellants. Stated simply, the only question before the trial court was whether appellants had illegally offered and sold shares in violation of the conditions of the CCC permit. They practically admitted the charges. Their only defense was that they had done so in a bona fide effort to save the company.

Appellants make no effort to distinguish which claimed erroneous evidentiary rulings apply to the charges of which they were acquitted and those of which they were convicted. Absent such distinction and appropriate elaboration, the contention may not be considered on appeal. Moreover, appellants do not attempt to provide appropriate references or specific elaborations as to claimed erroneous exclusionary rulings and thus have failed in their duty to adequately make the record on appeal, to demonstrate error, and to show prejudice. (See *In re Hochberg,* 2 Cal.3d 870, 875 [87 Cal.Rptr. 681, 471 P.2d 1]; *People* v. *Ham,* 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906]; *People* v. *Meyer,* 216 Cal.App.2d 618, 635 [31 Cal. Rptr. 285].)

Assuming, without conceding, that the record on appeal was in proper form, only relevant evidence is admissible. (Evid. Code, § 350.) The trial court, in its discretion, may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) A verdict or finding is not to be set aside, nor is the judgment based thereon to be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error is of the opinion that the error complained of resulted in a miscarriage of justice or it appears of record that: (a) the substance, purpose and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; (b) the ruling of the court made compliance with subdivision (a) futile; or (c) the evidence was sought by questions asked during cross-examination or re-cross-examination. (Evid. Code, § 354.)

It is the duty of the judge to control all proceedings during the trial

and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved. (Pen. Code, § 1044.)

With the foregoing principles in mind, it is evident that the trial judge did everything conceivable to permit the defense to introduce all relevant evidence. The trial consumed 11 weeks. Appellants were acquitted of the more serious charges. The defendants attempted to show that they acted in good faith in order to save the company. However, in effect, they admitted that they had not complied with the conditions of the permit and they wanted to get the entire history of CCC before the jury for the sole purpose of exposing the wrongdoing of others. In short, their defense was a red herring.

## Public Trial

During the course of the trial, the judge met with counsel and the parties in chambers for the purpose of ruling on motions, objections and offers of proof—matters of a purely legal nature. However, on January 4, 1972, when counsel and the parties were present in chambers, Murphy stated that he would not take part in any more *in camera* proceedings and demanded that all proceedings be conducted in the courtroom.

The following day, the court ordered counsel and the parties to meet in his chambers. From what appears in the briefs, Murphy and Benware refused to comply with the court's order. The court then denied Murphy's motion that all hearings relating to legal matters be held in the courtroom and again ordered the two men into chambers. When both refused, they were found in contempt and sentenced to the county jail until they complied with the court's order. Evidently they remained in jail a few hours and were released when they promised to appear. The trial continued until January 17 at which time both men again refused to appear in chambers or at the bench. Thereafter, the appellants did not appear in chambers or at the bench during the remainder of the trial. However, attorney Donahue did.

Appellants now maintain they were denied their constitutional right to a public trial.

Under article I, section 13 of the California Constitution, a defendant is guaranteed the right to a public trial. "Public trial" has been defined as follows: "The trial of the action, so far as the term 'public trial' is con-

cerned, consists in the proceedings for the impanelment of the jury, the opening statements of counsel, the presentation of evidence, the arguments, the instructions to the jury and the return of the verdict . . . ." (*People* v. *Teitelbaum,* 163 Cal.App.2d 184, 206-207 [329 P.2d 157].)

It is proper to hold *in camera* sessions where the subject matter of the conferences between court and counsel consists solely of questions of law, as opposed to matters advanced for the consideration of the triers of fact. (*People* v. *Teitelbaum, supra,* 163 Cal.App.2d 184; Witkin, Cal. Criminal Procedure, § 328 at p. 320.) Here, the trial court conducted *in camera* proceedings solely for the purpose of ruling on legal issues. Hence, there was no denial of a public trial within the meaning of the constitutional guarantee.

## MOTION FOR ACQUITTAL

At the conclusion of the prosecution's case, both appellants made a motion for acquittal on the ground that the conditions of the permit of January 2, 1969, were void and, therefore, could not form the basis of a valid criminal charge against them. As a corollary thereto, appellants further maintained that, assuming the commissioner may impose a condition of qualification on the offer and sale of securities if he finds that without such condition the offer will be "unfair, unjust and inequitable," the commissioner in this case did not issue formal written findings in connection with the permit issued to CCC and the conditions of the permit were therefore void.

The trial judge gave serious consideration to the granting of the motion. In fact, he "agonized" over his decision whether to dismiss the five charges pertaining to the violations of the Corporate Securities Law (counts V through IX inclusive) for a period of 11 days during which time he permitted the parties to argue the matter *in extenso*. The court then denied the motion for acquittal.

Appellants contend that the trial court erroneously denied their motion for acquittal pursuant to section 1118.1 of the Penal Code. In essence, the statute requires that the court order the entry of a judgment of acquittal if the evidence before it is insufficient to sustain a conviction of the charged offense.

What Murphy and Benware are urging is a highly strained interpretation of section 25141 of the Corporations Code. The prosecution's case rested on alleged violations in contravention of section 25540 of conditions

written into appellants' permit by the commissioner pursuant to his authority under section 25141.[4] Appellants contend that the conditions which they allegedly violated were void, and that they could not be charged with violating nullities. The contention that the conditions were nullities rests on the fact that the commissioner never made formal findings that an offering of Caduceus stock without the conditions would be "unfair, unjust or inequitable." Thus, we arrive at the question of whether such findings had to be made. The answer is, no.

Appellants argue that *Bostick* v. *Martin,* 247 Cal.App.2d 179 [55 Cal. Rptr. 322], controls this question. In that case the Court of Appeal held that under Financial Code section 5513,[5] the Savings and Loan Commissioner could refuse to execute his certificate of approval only if he made an explicit (as opposed to implied) finding that one of five enumerated grounds for disapproval existed. The Court of Appeal rested its decision on *Mahler* v. *Eby,* 264 U.S. 32 [68 L.Ed. 549, 44 S.Ct. 283], which required that an explicit finding of undesirability be made before aliens could be deported pursuant to a statute whose key words were "If the Secretary of Labor, after hearing, *finds* that such aliens are undesirable residents . . ." (Italics supplied.) The Court of Appeal also relied on the fact that Financial Code section 5513 listed five specific grounds on which the denial of the certificate was to be based, and the fact that section 11518 of the Government Code required specific written findings. It tied its package of constitutional and statutory arguments together with a string of policy arguments, the gist of which was that the presence of specific findings by administrative decision makers facilitates judicial review. (Cf. also *California Motor Transport Co.* v. *Public Utilities Com.,* 59 Cal.2d 270 [28 Cal.Rptr. 868, 379 P.2d 324].)

*Bostick* does not compel a reversal in this case. The real issue here is what the word "finds" means in a section 25141 case, and it can hardly be said that *Bostick* settles that question for all time. In the first place, it is merely the decision of a co-equal but not superior tribunal. In the second place, it construes a totally different section of another code. In the third place, the language of that section—"upon his examination and investigation"—suggests an effort at fact-finding beyond what section 25141 calls for, and makes more reasonable a requirement that the facts found be

---

[4]"The commissioner may impose . . . condition[s] [of qualification under the Code] . . . if the commissioner *finds* that without such condition[s] the offering will be unfair, unjust or inequitable." (Italics supplied.)

[5]"The commissioner may refuse to execute his certificate of approval, if upon his examination and investigation he *finds* any of the following:" [Here follow five grounds for refusal.] (Italics supplied.)

made known. Fourth, the Financial Code section in *Bostick* set forth just five specific bases on which a refusal could be made. It did not, as section 25141 does, grant a general equitable power to root out "unfairness"— at best a hazy concept, and one difficult to phrase as a specific finding of fact. Finally, the existence of Government Code section 11518 was one of the grounds for the *Bostick* decision. In its context in the Government Code (cf. § 11517), it requires written findings only in *contested* proceedings. Section 25141 has nothing to do with such proceedings.

A reasonable interpretation to be rendered to the word "finds" in section 25141 of the Corporations Code does not import into the words of the statute a requirement that findings of fact be made before section 25141 conditions can be effective. Such a requirement would serve no useful purpose. The tripartite formula under which such conditions are imposed (unfair, unjust, inequitable) really says the same thing three different ways; it would avail a promoter little to know that his proposed offering was "inequitable" as distinguished from "unfair." Nor does it make sense to require that the commissioner separately set forth "evidentiary facts" illustrating what he thinks is wrong with the proposed issue. *The very conditions that he imposes serve this function,* by correcting the offering's inadequacies. Thus, on judicial review, there is a clear reason for the commissioner's decision in that the conditions speak for themselves.

The word "finds" in section 25141 is simply a synonym for "determines" or "decides." It is a grant of discretion. Similar wording in other statutes (though not securities regulations) has been construed by other jurisdictions as granting a simple decision-making power without requiring a recitation of what has been "found." (See *State* v. *Florida Industrial Commission* (Fla. 1963) 151 So.2d 636; *School Dist. No. 7 of Wallowa County* v. *Weissenfluh* (1963) 236 Ore. 165 [387 P.2d 567]; *State* ex rel. *Higgins* v. *Mayor, etc. of the City of Beloit* (1889) 74 Wis. 267 [42 N.W. 110]; cf. also *State* v. *Hightower* (1946) 226 N.C. 62 [36 S.E.2d 649].)

As for authority from this state, there are two noteworthy cases. In *Brooks* v. *Stewart,* 97 Cal.App.2d 385 [218 P.2d 56], a board of supervisors issued certain ordinances pursuant to section 24301 of the Government Code, which permitted such action where the board "deemed" it to be in the public interest. The court held that no specific statement of what public interest was being promoted was necessary to the validity of the ordinances. In so doing, it equated the word "deem" with "find," a fact of some usefulness in deciding the case at bar. In the other California case, *Agnew* v. *Daugherty,* 189 Cal. 446 [209 P. 34], the Supreme Court held that the California Securities Act (a predecessor to the current statutory

scheme) did not violate due process of law. The court commented that the Corporations Commissioner could not act arbitrarily under a grant of power to limit the sale of securities to offerings "upon such terms and conditions as the commissioner may in said permit provide," and that the check on the commissioner's discretion lay in judicial review. No mention was made of requiring findings of fact.

In sum, the conclusion is inescapable that no findings of fact were required of the commissioner in the case at bar; that the conditions imposed by reason of his "finding" of inequity were valid; and that the motion for acquittal was properly denied.

### VAGUE CHARGES

Appellants next maintain that the provisions of the Securities Law of which they were convicted are vague and indefinite.

■ It is elementary that due process requires that the accused be given notice of the nature of the charges against him so he can prepare his defense. (*In re Hess,* 45 Cal.2d 171, 175 [288 P.2d 5]; *People* v. *Robinson,* 107 Cal.App. 211 [290 P. 470].) However, appellants do not articulate their reasons for claiming that the charges were vague or indefinite. A plain reading of counts V through IX indicates that they were charged with illegally offering and selling CCC shares in violation of the terms of the amended permit issued by the Commissioner of Corporations. While appellants seem to argue that the amendment to the indictment should not have been allowed or a continuance should have been granted to enable them to properly defend themselves on the amended indictment, these arguments have already been considered and rejected.

### JURY MISCONDUCT

■ Appellants claim there was misconduct on the part of the jury.

Specifically, they charge juror Sumner with the following wrongful acts: (1) that he concealed on *voir dire* examination the fact that he had prior jury experience; (2) that he denied he had any prior knowledge of the case but stated in the jury room that he had read a newspaper article concerning the case and made a remark in the presence of the other jurors that the case was "the biggest scandal in Orange County in 1969"; and (3) that he was "irked" by the presence of Murphy's children during the trial.

Juror Engstrom allegedly made the following statement during deliberations when the jurors returned to deliberate on Monday morning after the weekend adjournment: ". . . I did some checking over the weekend and

found that the prospectus is nothing more than just an advertisement . . ." or words to that effect.

A nonexhibit prospectus was present in the jury room, although it is not stated who illicitly brought the prospectus into the room.

Finally, appellants allege that jury foreman Roush was corrupted or influenced by the action of the trial judge in causing a letter to be written to his employer by which he obtained his full salary.

In support of the charges of misconduct, appellants filed affidavits at the time of the hearing on a motion for a new trial executed by some of the jurors. They also called some of the jurors as witnesses. However, the affidavits of the jurors were ordered stricken on the ground that evidence could not be received as to the effect of claimed misconduct on the minds of the jurors. (Evid. Code, § 1150; *People* v. *Hutchinson,* 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 302, p. 3109.)

Juror Sumner was called to testify and he stated the following: He denied any pretrial knowledge of the case or the parties; he denied reading any newspaper article concerning the trial; while he did make a remark in the jury room to the effect that he heard or remembered something about this being the "biggest scandal in Orange County in 1969," he had no recollection of any fact in the case at the time of *voir dire;* after hearing several weeks of evidence and having heard the words "Caduceus" and "Casualty Insurance Company" mentioned several times, it refreshed his recollection that he had a conversation with somebody at the time the case "broke" or heard something at the time the indictments were handed down to the effect that the case constituted a scandal; after two days of deliberations, he remembered the remark about what he had heard, which was the reason for making the statement; he was not irked by the presence of appellant's children in the courtroom during the course of the trial; he did not conceal the fact that he had prior jury service in San Bernardino County; Benware was wrong if he claimed he saw him reading any news article about this case on November 29, 1971 (after *voir dire*).

Juror Engstrom denied making any statement to the effect that he had done some "checking" over the weekend; he may have said that he had been "thinking" about the case over the weekend; he saw no other prospectus in the jury room; he did not do any checking over the weekend concerning a prospectus.

Several of the jurors testified to hearing the "scandal" remark. Others testified they did not hear it.

Jury foreman Roush denied that he had ever been influenced by any act of the trial judge. The trial judge did not get him full pay from his employer. To the contrary, he gave the following version of the salary matter: He asked the clerk or bailiff for information regarding his salary inasmuch as the trial had been a lengthy one and he was afraid his employer would in effect "dock him" because of the length of the trial; the clerk or bailiff told him to go to an administrative office (presumably the court administrator's office) as it sometimes helped to get a letter to the employer and explain the situation; someone (not the judge) wrote a letter to his employer (North American) and sent a copy of the letter to the judge; he never told Murphy that the judge had written a letter by which he obtained $1,000-$2,000 in salary.

As to the mysterious prospectus, several jurors testified that they had seen it and others had not.

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150; *People* v. *Hutchinson, supra,* 71 Cal.2d 342.)

■ As a general rule, the affidavits of jurors may not be used to impeach a verdict; an exception to this general rule is that affidavits of jurors may be used to set aside a verdict where the bias or disqualification of a juror was concealed by false answers on *voir dire* examination. (*People* v. *Castaldia,* 51 Cal.2d 569, 572 [335 P.2d 104].) ■ Information irregularly obtained by jurors may constitute prejudicial misconduct. (*People* v. *Wong Loung,* 159 Cal. 520 [114 P. 829].) ■ Misconduct of a juror is grounds for a new trial where such misconduct fails to disclose the prejudicial state of mind of a juror. (*People* v. *Quiel,* 68 Cal.App.2d 674 [157 P.2d 446].)

■ Here, there was a clear conflict in the evidence as to whether jurors Engstrom or Sumner were guilty of misconduct and the trial court found that they were not. Similarly, the presence of the foreign prospectus in the jury room was known to some of the jurors but unknown to others. Finally, there was absolutely no proof that the judge had ever written a letter on behalf of Roush.

It is elementary that with respect to alleged jury misconduct where questions of fact are presented for the trial court, its findings will be upheld in the absence of a showing its discretion was abused. Where the alleged misconduct is entirely speculative in nature, it is settled that the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation. (*People* v. *Perez,* 9 Cal.3d 651, 660 [108 Cal.Rptr. 474, 510 P.2d 1026]; *Bardessono* v. *Michels,* 3 Cal.3d 780, 795 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].)

 The only charge of juror misconduct which had any substance whatsoever was juror Sumner's remark to the effect that this case constituted a big scandal in 1969. However, there is no indication that Sumner was biased or prejudiced against the defendants or that he withheld any prior knowledge of the case from the court or his fellow jurors. It appears that he recalled reading or hearing something about the case after the jury commenced deliberations. His "scandal" remark constituted harmless comment.

### BIAS OF TRIAL JUDGE AND MISCONDUCT OF PROSECUTOR

 Appellants maintain that Judge Van Tatenhove was biased and prejudiced against them and that they were thus denied a fair trial. In effect, appellants are claiming that the trial judge joined with the prosecutor in the successful effort to convict them. Appellants cite some 20 odd instances of misconduct. However, they are a mere recap of the attack made on the entire trial. Most of the points have heretofore been covered. (For example, the court's rulings on motions for continuances, for appointment of counsel, its rulings on the admission of evidence and its order allowing an amendment to the indictment.) In effect, appellants categorize as judicial misconduct every ruling the judge made which was adverse to them.

It is the duty of the trial judge to control the proceedings and it is clear from the record that the duty was discharged without a trace of partiality, let alone misconduct. (Pen. Code, § 1044.) The trial judge specifically instructed the jury that they were not to take a cue from him and it is presumed that the jury followed his instruction. (*People* v. *Kemp,* 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913].)

Insofar as any misconduct on the part of the prosecutor is concerned, such matters may not ordinarily be considered for the first time on appeal. (*People* v. *Amaya,* 40 Cal.2d 70, 78 [251 P.2d 324].) Here no admonition was ever requested in the trial court. Again, appellants claim as miscon-

duct every advocate action taken by the prosecutor. There was no misconduct as the term is judicially defined and recognized. (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].)

Consequently, the appellants' assertion that the trial court and the district attorney "teamed up" in order to obtain a conviction is just not well-taken. The argument also ignores the fact that the defendants were acquitted of the four more serious charges.

### FAILURE TO SEQUESTER THE JURY

■ Appellants contend the trial court committed prejudicial error in failing to sequester the jury over the weekend prior to the return of the verdicts on the following Monday. When it came to the court's attention on February 4, 1972 that the jury had not arrived at a verdict, the court permitted the jury to separate with the customary admonition. The jury returned on Monday and arrived at a verdict a few hours later. Appellants claim that the trial judge should have sequestered the jury on Friday and his only reason for excusing the jury on Friday was so that he could engage in a tennis game over the weekend, although he told the jury he had "to go out of the city." In effect, appellants claim that the jurors should have been allowed to continue deliberations over the weekend inasmuch as they would have come in with defense verdicts on all counts if they had been allowed to do so.

The contention is spurious. Section 1121 of the Penal Code provides it is within the discretion of the trial court whether a jury will be sequestered or permitted to separate with proper admonishment.

### JURY INSTRUCTIONS

Appellants contend the trial court committed prejudicial error in giving or not giving certain instructions and in not permitting Murphy the opportunity to submit and argue instructions.

■ In the first place, Murphy adamantly refused to participate in any *in camera* sessions conducted after January 17. He now complains that he was denied the opportunity to submit and argue the instructions. Nothing the court did precluded him from offering proposed instructions. It was his own conduct. However, attorney Donahue submitted several instructions and many of those offered were given.

Appellants charge that some of the instructions requested were erroneous or incomplete. However, they have not cited authority to support their

argument. Moreover, the instructions attacked constitute a correct statement of law.

■ Appellants also argue that the court erred in refusing to give several instructions proposed by them. Again, they have completely failed to demonstrate that error was committed in the rendition of the instructions or in refusing instructions. They merely set forth their contentions without any reference to the record or without any attempt to demonstrate error. Having failed to establish that any prejudice resulted from their contentions which would support a conclusion that a miscarriage of justice occurred, an appellate court need not consider the matter. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Next, appellants claim the trial court erred in not furnishing a copy of the indictment to the jury. However, the record indicates that the court was concerned that the indictment had been amended by interlineation and therefore might lead to confusion. Therefore, the indictment, as amended, was read to the jury both by the clerk and again by the court. There was no error in this procedure.

■ Finally, appellants charge that the court failed to instruct correctly on what may be characterized as the "good faith" defense. They argue that an instruction restating Corporations Code section 25700 or section 31511 (they are worded the same) should have been given. Section 25700 provides: "No provision of this law imposing any liability applies to any act done or omitted in good faith in conformity with any rule, form, permit, order, or written interpretive opinion of the commissioner, or any such opinion of the Attorney General, notwithstanding that the rule, form, permit, order, or written interpretive opinion may later be amended or rescinded or be determined by judicial or other authority to be invalid for any reason." In effect, the section provides for an estoppel against the state for good faith detrimental reliance.

An instruction framed in the language of section 31511 was refused. However, a modified instruction was given which was phrased, in part, from section 25700. It reads as follows: "No provision of this law imposing any liability applies to any act done or omitted in good faith in conformity with any rule, permit, [or] order of the commissioner."

All that was excised from appellants' proposed instruction was surplusage. Actually, there was no evidence that their acts were performed in good faith or that they were misled in any way by the government.

While an accused is entitled to have the jury correctly instructed on any and all tenable theories of his case (*People* v. *Jeter,* 60 Cal.2d 671 [36 Cal.Rptr. 323, 388 P.2d 355]; *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281]; Witkin, Cal. Criminal Procedure, § 495 at p. 501), reliance on official acts was not a tenable theory in this case. To the contrary, the record reflects that the permit was valid, that the conditions were properly imposed, and that appellants wrongfully violated said conditions.

 We are left with appellants' attempt to impeach the verdicts with affidavits of jurors setting forth a claim that the instruction given on the "good faith" defense was confusing. Had the instruction been clearer, these jurors swear, they would have acquitted defendants on all counts. These are nothing but self-serving statements introduced to show the jurors' mental processes and do not constitute the proper method of impeaching a verdict. (See Evid. Code, § 1150; *People* v. *Hutchinson, supra,* 71 Cal.2d 342.)

As previously indicated, an instruction on the defense of good faith was unnecessary. There was no evidence of good faith. To the contrary, there was conclusive evidence that appellants offered and sold CCC shares in violation of the conditions of the permit.

The judgment (order granting probation) is affirmed.

Tamura, J., and Kaufman, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 7, 1974.