Filed 10/21/24  P. v. Recalde CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B328368 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA091814) |
| v. | |
| FRED RECALDE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Terrell, Judge.  Affirmed with directions.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

A jury convicted defendant Fred Recalde of two counts of committing a lewd act upon a child and one count of oral copulation or sexual penetration of a child 10 years old or younger. On appeal, Recalde contends the trial court erred in denying his motion to dismiss based on the government's failure to collect and timely disclose certain evidence, which Recalde claims violated his constitutional rights. He also contends the court erred in allowing the People to amend the information on the eve of trial and in excluding him from testimony readback in the jury room. In addition, Recalde argues, and the People concede, that the trial court miscalculated his sentencing credits. Recalde also claims the court abused its discretion in its restitution award. We affirm the judgment and the restitution order, with directions to amend the abstract of judgment to properly calculate Recalde's sentencing credits.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Prosecution Evidence*

Elena H. used to live next door to Recalde. She was friends with his daughter, Tiffany, and played at the Recalde home about three times per week. Elena testified that when she was nine or 10, she walked into the guest bathroom while Recalde was in the shower. She left and went to the garage. Recalde got dressed and spoke to Elena in the garage about the incident. Recalde said something like, " 'You saw me, let me see you.' " According to Elena, she then pulled down her pants, and Recalde either touched or licked her vagina.

Elena also testified that she and Recalde once hid in a shed during a game of hide and seek at Recalde's house. Recalde touched Elena's breasts under her shirt while they were in the shed, and also touched her vagina.

2

Elena estimated that Recalde either touched or licked her private areas nearly half the times she went to his house. Recalde instructed her to not tell anyone about his conduct.

Recalde's neighbor Madison P. was also friends with Tiffany. When Madison was 10, 11, or 12, Tiffany and Madison were tickling each other or wrestling at Recalde's house. Madison testified that Recalde joined in and rubbed her vagina outside of her clothes.

When Madison was 16 or 17, she went to Disneyland with Recalde and Tiffany. They stayed overnight in a hotel. Madison and Tiffany began wrestling or tickling each other in the hotel room, and Recalde joined in and touched Madison's stomach and "breast area."

Madison also said that she would often drive places with Recalde and Tiffany, and Madison would typically sit in the front passenger seat. While they were driving, Recalde would rub her thigh with his hand.

### Defense Evidence

Recalde testified that Elena walked in on him in the shower once, and he asked her to leave and close the door. About a month later, she walked in on him changing clothes in a different bathroom. On both occasions, Recalde instructed Elena to not walk in on people in the bathroom. When he discussed the second incident with Elena, she responded, " 'Oh, do you want to see me naked, too?' " and pulled down her pants. Recalde told her, " 'No, you cannot do this,' " and then Elena pulled up her pants and ran away.

Recalde also recalled a hide and seek game during which he hid in a shed with Elena. However, they were only in the shed for less than a minute, and he did not touch her. He further

testified that the door to the shed would swing open unless it was latched from the outside.

Recalde denied touching or licking Elena's vagina. He told Elena that he was not going to tell her parents about the times she walked in on him in the bathroom, because Elena and Tiffany "got along really well" and he "didn't want to take it out on them because that would be wrong . . . ."

Recalde testified that he poked Madison around "the top portion of the ribcage" one time when she and Tiffany were tickling each other. He further testified that Tiffany and Madison did not wrestle or tickle one another during the Disneyland trip, and that he did not touch Madison inappropriately. According to Recalde, Madison sat in the back seat of the car on the trip.

Tiffany testified that she never saw or heard about Recalde acting inappropriately. She said Elena misbehaved, had anger issues, and was not a truthful person. According to Tiffany, she did not wrestle or tickle with Madison during the Disneyland trip, and Recalde did not touch Madison inappropriately on that trip. Tiffany said Madison sat in the back seat on the way to and from Disneyland. She also testified that Madison was a dishonest person.

Three of Recalde's friends testified that he was trustworthy and honest, and that they did not believe he is the type who would sexually assault a child.

Now-retired Los Angeles County Sheriff's Department (the Department) Detective Sarah Gillis investigated the case. Gillis testified that she had discretion whether or not to electronically record witness interviews. She had the power and ability to secretly record interviews in person and on the phone, and she

4

also could use recording equipment in Department interview rooms and at forensic interview centers.

Gillis interviewed both Elena and Madison multiple times, but she did not record the interviews. She did not record these interviews because "they're actually under obligation of the power of subpoena to come before the court to share their story; whereas, suspects are not." Gillis also interviewed Elena's parents, Elena's sister Jenna, Madison's parents, Madison's sister Mackenna, Mackenna's friend Kobe, and Kobe's mother. She also did not record these interviews. Instead, Gillis prepared reports summarizing the interviews she conducted during her investigation.

Gillis recorded her interviews with Tiffany and with Recalde's son, Ryan. To make Ryan feel at ease, Gillis told Ryan that she records "everything because no one believes the police." Gillis recorded the interviews with Recalde's children because she believes a suspect's close family members are more likely to recant inculpatory statements, particularly if they reside with the suspect.

Defense expert Dr. Bradley Mcauliff, an expert in child sexual abuse and suggestibility in interviewing, opined that it was unusual that there were no recordings of the victim and witness interviews in this case. He noted that children may be susceptible to suggestion in certain circumstances. For example, children who are asked leading questions are more likely to provide inaccurate responses as compared to children who are asked neutral questions. Similarly, when a child is asked the same or similar questions repeatedly, the child may think they gave the wrong answer, leading them to provide a different or inaccurate answer. A child's responses may also be affected by

the interviewer's nonverbal behavior, such as a smile or a frown. According to Mcauliff, the interviewer's behavior may sometimes contaminate a child's report of a situation. He opined that audio or video recordings of interviews are therefore useful to help assess whether the interviewer's questions or demeanor affected the child's answers.

### Trial and Sentencing

Elena eventually told her sister and her parents about Recalde's conduct, and her parents called the police. Though Madison also eventually told her parents about what had occurred with Recalde, her mother initially opted not to report it to law enforcement after speaking with friends and acquaintances knowledgeable about what Madison might experience if she made a police report. In the course of the investigation into the allegations involving Elena, Gillis learned that Madison would also frequent Recalde's home. Gillis subsequently contacted Madison's mother who arranged for Gillis to interview Madison. Recalde was arrested on November 2, 2018.

The People filed a five-count information charging Recalde with four counts of committing a lewd act upon a child (Pen. Code, § 288, subd. (a))[1] (counts 1, 2, 4, and 5), and one count of oral copulation or sexual penetration of a child 10 years old or younger (§ 288.7, subd. (b)) (count 3). Counts 1 through 4 alleged misconduct relating to Elena, and count 5 related to Madison. The information included a multiple victim allegation on all counts. (§ 667.61, subds. (b) & (e).)

---

[1] All further undesignated statutory references are to the Penal Code.

6

Just before trial, the People amended the information to add several allegations of aggravating circumstances: That the victims were particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)), that Recalde held a position of trust (*id.,* rule 4.421(a)(11)), that the crimes involved separate acts of violence (*id.*, rule 4.425(a)(2)), and that the crimes occurred at different times and separate places (*id.,* rule 4.425(a)(3)).

A jury convicted Recalde on counts 2, 3, and 4, and acquitted him on counts 1 and 5 (the sole count involving Madison). It found not true the multiple victim allegation and the aggravating circumstance that count 3 involved crimes committed at different times and separate places. The jury found true the remaining allegations.

On January 24, 2023, the court imposed an aggregate sentence of eight years plus 15 years to life, consisting of (1) the midterm of six years for count 2; (2) one-third the midterm, or two years, on count 4, to run consecutively; and (3) 15 years to life for count 3, to run consecutively.

After hearing argument and evidence regarding restitution, the court ordered Recalde to pay Elena's parents $7,200 plus interest for her future counseling, and $55,250 plus interest for moving expenses.

Recalde timely and separately appealed his conviction and the restitution order. This court consolidated the two appeals.

## DISCUSSION[2]

## I. Recalde Has Not Established Any Fourteenth Amendment Due Process Violation

Recalde raises several related arguments under the due process clause of the Fourteenth Amendment, based on the government's failure to properly record, preserve, and disclose evidence. He contends the trial court should have dismissed the case, and that the verdict must be reversed. We disagree.

### a. Additional factual background

In November 2020, Recalde filed a motion to compel discovery. The motion argued that Gillis interviewed the victims and several family members, but claimed she did not record those interviews or prepare "rough notes" or "verbatim accounts" of her interviews. The motion requested any and all materials relating to Gillis's victim and witness interviews.[3]

---

[2] The parties submitted nearly 250 pages of briefing on appeal. However, "[a]n appellate court is not required to address all of the parties' respective arguments, discuss every case or fact relied upon by the parties, distinguish an opinion just because a party claims it is apposite, or express every ground for rejecting every contention advanced by every party." (*People v. Garcia* (2002) 97 Cal.App.4th 847, 853.) We therefore address the most pertinent arguments and authorities in our analysis of all substantive issues raised on appeal.

[3] The motion also sought records relating to Deputy Inzalaco, who administered a polygraph exam to Recalde shortly after his arrest. Gillis watched from another room, but she testified that the recording function on the device she used was not working at the time. The polygraph device itself was also capable of recording, but Inzalaco asserted that it too was not working at the time and no recording was created. Recalde mentions these

8

During a hearing on the discovery motion, Gillis testified that the Department did not have any policy about recording interviews with children.[4] Gillis interviewed Madison and Elena,

facts in his appellate briefing, but he does not expressly cite them in support of his contentions. Though we by no means condone the Department's investigative methods, we would conclude they do not reflect any due process violation. The trial court found there was no evidence any recordings of the polygraph were ever made, and this finding is supported by substantial evidence. As we discuss *post*, "due process does not require the police to collect particular items of evidence." (*People v. Montes* (2014) 58 Cal.4th 809, 837 (*Montes*).) Nor is there any evidence of any bad faith. (*People v. Flores* (2020) 9 Cal.5th 371, 397 (*Flores*) ["negligence does not establish constitutional bad faith"].) Moreover, by default the results of the polygraph exam would have been inadmissible at trial. (Evid. Code, § 351.1.)

[4] During a recess in Gillis's trial testimony almost three years later, the prosecution produced a recently obtained screenshot from the Department's internal intranet website (hereinafter, the "document"), entitled "victim interviews." The document indicated that recording victim interviews was not recommended in sexual assault cases, though it was unclear if the document reflected current Department policy. The court denied Recalde's motion for a mistrial based on allegations of late discovery. Recalde also argued the document was "*Brady* material" (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)), but after Gillis testified outside the presence of the jury that though she remembered being told there was no policy requiring her to record witness interviews, she had been unaware of the document until that day, the court found the document was not *Brady* material and granted Recalde's request that the parties not refer to it during trial. Recalde's appellate briefing notes that his trial counsel described this document as "possible *Brady* material" and

but she did not record those interviews.[5]  Gillis kept a case journal during her investigation, which roughly outlined interviews and other investigatory activities.  She did not recall if she took notes during the interviews in this case, but any notes would be in the original case file.  When Gillis left the Department, she turned in her recording device and all data stored on it was deleted so another employee could use it.  The

---

"[w]hile the defense believed the paper constituted *Brady* material as potentially exculpatory, the trial court said it was not and believed it had no relevance."  It is unclear whether Recalde argues on appeal that the delayed production of the document constituted a *Brady* violation, and, as such, the court erred in denying Recalde's motion for a mistrial.  If Recalde is making such a claim, we would reject it.  Although the delay in identifying the document is troubling, the document recommended against recording interviews, consistent with Gillis's practice.  As the trial court correctly noted, this is "the opposite of exculpatory" and, as such, does not satisfy the *Brady* test of "evidence favorable to" Recalde.  (*Id*. at p. 87.)

[5]     Gillis also interviewed Tiffany.  She recorded the interviews, but the recordings were misplaced.  The court ordered the prosecution to take additional steps to locate them, and two recordings were eventually located and produced to the defense.  Recalde's appellate briefing describes these facts, but he does not argue that the delay contributed to the government's outrageous conduct, nor that it caused any specific prejudice.  However, even if Recalde raised such an argument, we would reject it.  The record does not establish that these recordings included any exculpatory evidence.  (*Brady*, *supra*, 373 U.S. at p. 87.)  The record also does not reflect that the delay was caused by anything more than negligence, and "negligence does not establish constitutional bad faith."  (*Flores*, *supra*, 9 Cal.5th at p. 394.)

prosecutor represented to the court that she had requested files from the Department, but offered to "call over to the sheriff's department . . . and see what exists" and request the Department's file on the investigation.

After further discovery efforts, the court held a pretrial hearing at which the parties presented limited testimony about Gillis's and the Department's "custody and control of computer digital files." Department Sergeant Brian Hudson testified that he supervised Gillis when she worked as a special victims bureau detective. Hudson testified Department employees would save reports and other materials in a folder dedicated to the case. Due to their large size, detectives were expected to upload audio recordings into a system called "Prelims." Hudson and another employee were able to access and search the folders and drives to which Gillis had access when she worked for the Department, but they did not find any materials relevant to this case.

Department Detective Richard Simmons shared an office with Gillis. Simmons gave Gillis an external hard drive and taught her to save items in folders on the hard drive using a shortcut. However, this shortcut did not save the files on the computer itself.

Gillis testified that she did not realize Simmons's storage method saved her data only to the external hard drive, and not to her computer. She did not store any interviews of any witness in this case to Prelims or any other Department storage system, because she assumed they were saved on the "database" on her hard drive. Gillis retained the hard drive, which she had personally purchased, when she retired. At some point before August 2022, the hard drive was provided to the defense.

11

In July 2022, Recalde filed a motion to dismiss based on the government's outrageous conduct and *Brady* violations. The motion argued that Gillis and the Department engaged in outrageous conduct by not recording witness interviews, allowing data to be deleted by circumventing Department data storage procedures, and allowing Gillis to retain the external hard drive she had used while working as a detective.

At the hearing on Recalde's motion to dismiss, the court recognized that the Department's conduct was "far from perfect." However, the court found that the victim and witness interviews were not recorded either because of faulty equipment (i.e., the equipment malfunctioned during the polygraph exam), or because recording was not required and Gillis decided a written report would suffice. The court expressly found Gillis's explanation credible. Although Gillis conceded she did not comply with Department data storage practices, the court found no indication of "malfeasance" nor any "deliberate attempt to undermine the defense." The court also noted that the hard drive was provided to the defense and there was no evidence the drive had been compromised. The court therefore denied the motion to dismiss.

### b. Law enforcement did not engage in outrageous government conduct

Recalde argues the trial court erred in denying his motion to dismiss based on the government's supposedly outrageous conduct. We disagree.

The United States Supreme Court has held that a trial court may dismiss a criminal case based on outrageous government conduct, defined broadly as "conduct that shocks the conscience." (*Rochin v. California* (1952) 342 U.S. 165, 172.) Our high court has "left open the possibility that we might accept the

12

outrageous conduct defense," but has not formally adopted it. (*People v. Smith* (2003) 31 Cal.4th 1207, 1224–1227.) Nonetheless, several Courts of Appeal have recognized the defense as potentially applying where the police manufactured a crime, engaged in criminal activity, or were motivated solely by the desire to convict the defendant. (*People v. Wesley* (1990) 224 Cal.App.3d 1130, 1144.) Outrageous conduct may also occur where the government interfered with "the attorney-client relationship, and prevented [the defendant] from receiving a fair trial." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1007 (*Guillen*).)

Several courts have held that any ruling on a motion to dismiss based on outrageous conduct is reviewed for abuse of discretion. (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445; *People v. Shrier* (2010) 190 Cal.App.4th 400, 418.) Others have reasoned that the analysis is a mixed question of fact and law. (*Guillen, supra,* 227 Cal.App.4th at p. 1006; *People v. Uribe* (2011) 199 Cal.App.4th 836, 856 (*Uribe*).) Under the latter approach, the appellate court first assesses the facts. " ' "[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." ' " (*Uribe*, at p. 856.) The court then applies the law to those established facts de novo, to determine whether the government's actions constitute outrageous conduct. (*Id.* at p. 858.) We need not weigh in on this split of authority, because even under the latter standard, we affirm.

13

Here, Gillis prepared written reports instead of recording several victim and witness interviews. She explained there was no Department policy requiring her to record these interviews, and the trial court found her credible. Gillis also failed to comply with Department data retention practices by saving files to an external hard drive and bypassing Department storage systems. She took the hard drive she had used at work with her when she retired. However, she believed any files transferred to the hard drive were also stored on her work computer. The court appeared to implicitly find Gillis's explanation credible, noting there was no evidence that she was "trying to undermine [Recalde's] . . . rights to discovery" or his right to a fair trial. We defer to the court's credibility findings, as they are supported by substantial evidence. (*Uribe*, *supra*, 199 Cal.App.4th at p. 856.)

Applying the law to these facts (*Guillen*, *supra*, 227 Cal.App.4th at p. 1006), we conclude that Gillis's decision to not record witness interviews and her mismanagement of certain data was not outrageous government conduct. For example, in *People v. Erwin* (1993) 20 Cal.App.4th 1542 (*Erwin*), an investigator chose not to record pretrial interviews with a child victim. At the preliminary hearing, the investigator admitted that he had a practice of not recording such interviews because the recordings "might memorialize for exploitation by the defense inconsistencies in a child witness's account of an alleged offense." (*Id*. at p. 1551.) The trial court found this practice troubling, but recognized that the law does not "impos[e] a duty on the police to use electronic recording devices to collect and preserve all witnesses' statements." (*Id*. at p. 1552.) The court therefore rejected the defendant's due process claims and denied his motion to dismiss. (*Ibid*.)

Similarly, here, the trial court described the Department's conduct as "far from perfect," an assessment we share. Gillis was either ignorant of or disregarded Department data storage policies. Although there is no evidence that Gillis had a practice of not recording interviews to avoid witnesses being impeached with prior inconsistent statements, her decision to not preserve this evidence was arguably negligent or reckless. But Recalde has not identified any authority supporting that this sort of behavior, with no evidence of malicious intent, constitutes outrageous government conduct that could warrant dismissal. As the *Erwin* court reasoned, the defendant's remedy in such a scenario is "to impeach the prosecution's witnesses by exposing the practice to the jury at trial." (*Erwin, supra*, 20 Cal.App.4th at p. 1552.) Indeed, Recalde's trial counsel questioned Gillis in front of the jury about her investigatory decisions and motives at length, and presented expert testimony opining that failure to record interviews with child victims may cast doubt on the veracity of their accusations. Therefore, dismissal "would have been out of proportion to the detective's offense, given that respondent clearly had other means available to challenge the consistency, accuracy and veracity of the victim's account of the crime." (*Id.* at p. 1553.)

Recalde cites several cases in which courts determined that law enforcement's conduct was outrageous and contends Gillis's behavior was similar. Yet, in each example cited, the state proactively and egregiously interfered with the defendant's right to counsel. For example, in *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1260, dismissal was required where the prosecution hired an investigator to eavesdrop on confidential attorney-client communications. In *Boulas v. Superior Court*

15

(1986) 188 Cal.App.3d 422, 429, the prosecution offered a plea deal contingent on the defendant firing his chosen counsel, and then withdrew the deal after the defendant did so, thus warranting dismissal with prejudice. And in *People v. Moore* (1976) 57 Cal.App.3d 437, 440–442, dismissal was required where the prosecution instructed the defendant to not tell his attorney about undercover work the defendant was performing for the prosecution, and falsely told the defendant that his attorney had been disbarred. In contrast, here, there is no evidence that anyone interfered with Recalde's relationship with his counsel. Indeed, the trial court expressly found no evidence of any "deliberate attempt to undermine the defense."

Recalde also contends the prosecution behaved outrageously by coaching Elena to provide false testimony.[6] The evidence contradicts this claim. During the preliminary hearing, Recalde's counsel asked Elena if anyone instructed her to say she did not remember if she was unsure of the answer to a particular question. Elena responded, "No, it's just – I just say that so I do not say the wrong answer." To the extent this testimony

---

[6] Recalde claims this supposed coaching also violated his due process rights because it was prosecutorial misconduct. (See, e.g., *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Recalde failed to raise this argument below. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*Ibid*.) In any case, we would reject this claim for the reasons discussed above: The evidence does not support that the prosecution instructed Elena to lie in her trial testimony.

16

suggested that Elena had testified that she did not recall something when, in fact, she was uncertain, the testimony makes clear this was Elena's choice, and not based on any direction from Gillis or the prosecutor. Moreover, at trial, Recalde's counsel asked Elena if she was coached to say she did not remember so as not to say the wrong answer, and she responded clearly: "No." Elena also testified that Gillis and the prosecutor told her to tell the truth, and said that she did, in fact, tell the truth at trial. The evidence does not support that Gillis or the prosecutor improperly coached Elena, and therefore this point does not support Recalde's claim of outrageous government conduct.

### c. *Recalde has not established any* Brady *violation*

Recalde next argues Gillis violated *Brady* by not electronically recording several victim and witness interviews. We disagree.

The due process clause of the Fourteenth Amendment prohibits suppression of "evidence favorable to an accused" which is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282.) "Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) However, the trial court's factual findings are entitled to great weight if supported by substantial evidence. (*Ibid.*)

17

Recalde has not established that Gillis's failure to create recordings of witness interviews amounts to suppression of evidence. Indeed, "*Brady* merely serves ' "to restrict the prosecution's ability to *suppress* evidence rather than to provide the accused a right to criminal discovery." ' " (*People v. Mena* (2012) 54 Cal.4th 146, 160; *Montes, supra*, 58 Cal.4th at p. 837 ["due process does not require the police to collect particular items of evidence"]; *Erwin, supra*, 20 Cal.App.4th at p. 1552 ["The law falls short of imposing on law enforcement officers a duty to ' "gather up everything which might eventually prove useful to the defense" ' "].) Gillis did not record the interviews in question, and therefore no recordings were suppressed.[7] Recalde has not identified any case holding that law enforcement's decision to not record an interview constitutes suppression of evidence under *Brady*, nor has he articulated any reasoned argument as to why we should expand the law under the facts of this case.

Moreover, even if Gillis's decision not to record the statements could qualify as suppression of evidence, Recalde has not established that the interviews yielded any exculpatory or impeaching information. Recalde claims there would be "inevitable" discrepancies that would allow for impeachment. He also argues that a recording might have revealed that "Gillis coached, or persuaded, or influenced what the girls said." Yet,

---

[7] Recalde argues that Elena testified that she "may have heard a recording device" during one interview with Gillis, and he therefore contends Gillis made a recording and suppressed or destroyed it. In fact, Elena's testimony was that she may have later heard a recording of her interview with Gillis, but she did not remember. The evidence otherwise overwhelmingly supports that Gillis did not record any interview with Elena.

this is entirely speculative, and " '*Brady* . . . does not require the disclosure of information that is of mere speculative value . . . .' " (*People v. Williams* (2013) 58 Cal.4th 197, 259.)  "Because defendant has not shown that the prosecution withheld evidence that was both 'favorable and material' to the defense [citation], his claim is without merit."  (*Ibid.*)

### d. *Recalde has not established any* Trombetta/Youngblood *violation*

Recalde next argues that his due process rights were violated under the standards set out in *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*); or, in the alternative, that his trial counsel was ineffective for failing to raise this specific argument below.  We again disagree.[8]

Under *Trombetta*, the state violates a defendant's due process rights by failing to preserve evidence whose exculpatory value "was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available

---

[8]      Recalde's trial counsel did not cite *Trombetta* or *Youngblood* in his motion to dismiss or at any hearing.  However, the People concede this argument was not forfeited, because it does not " 'invoke facts or legal standards different from those the trial court was asked to apply,' " and merely adds a Constitutional gloss to the arguments raised below.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809.)

Moreover, even if counsel's failure could constitute a forfeiture, as discussed *ante*, the record does not reflect the lack of a satisfactory rationale for such omission nor has Recalde demonstrated a reasonable probability of a different result had his counsel raised an argument under *Trombetta* or *Youngblood*.

19

means." (*Trombetta*, *supra*, 467 U.S. at p. 489.) "As an alternative to establishing the apparent exculpatory value of the lost evidence, *Youngblood* provides that a defendant may show that ' " 'potentially useful' " 'evidence was destroyed as a result of bad faith." (*People v. Fultz* (2021) 69 Cal.App.5th 395, 424–425 (*Fultz*), citing *Youngblood*, *supra*, 488 U.S. at p. 58.)

We review a trial court's decision under *Trombetta/ Youngblood* for substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 549 (*Duff*).) We defer to the trial court's credibility findings. (*People v. Woods* (1999) 21 Cal.4th 668, 673; *Fultz*, *supra*, 69 Cal.App.5th at p. 429.)

Substantial evidence supports the trial court's denial of Recalde's motion to dismiss under the standards articulated in *Trombetta* and *Youngblood*. Recalde's challenge is based solely on Gillis's decision to not record several interviews. Stated otherwise, he claims Gillis's failure to create recordings is akin to destruction of evidence. Yet, Recalde fails to articulate how the government could have destroyed nonexistent recordings in violation of *Trombetta*. (*People v. Thomas* (2012) 54 Cal.4th 908, 929 [rejecting *Trombetta* claim as to unrecorded portion of interview].) Even assuming Gillis's decision not to record the interviews constitutes "destruction" of evidence, Recalde fails to explain what exculpatory information was "apparent" from the interviews. (*Trombetta*, *supra*, 467 U.S. at p. 489.) He merely claims there would be "inevitable discrepancies" between the pretrial interviews and trial testimony, which Recalde's counsel could have exploited during cross-examination. However, speculation is insufficient to establish that an unrecorded interview would have yielded any exculpatory or impeaching evidence. (*Thomas*, at p. 929.)

Recalde also contends Gillis destroyed "potentially useful" evidence in bad faith. (*Youngblood*, *supra*, 488 U.S. at p. 58.) He notes that our reviewing courts, citing *Youngblood*, have "suggested that there may be an appropriate case where the failure to collect evidence might warrant due process considerations." (Citing *Montes*, *supra*, 58 Cal.4th at p. 838; *Miller v. Vasquez* (9th Cir. 1989) 868 F.2d 1116, 1119, 1121 [allegations that officer used extremely derogatory expletive to describe petitioner, tried to dissuade witnesses from testifying, and may have harbored animosity toward petitioner due to his perceived gang membership established colorable claim of bad faith motivating officer's failure to obtain victim's bloody jacket or photograph petitioner's injuries].) Yet, both *Montes* and *Miller* imposed qualifiers absent here—that law enforcement's failure to collect potentially exculpatory evidence was motivated by bad faith. (*Montes*, at p. 810 [rejecting *Youngblood* claim where appellant failed to establish bad faith]; *Miller* at p. 1120 [citing *Youngblood* to conclude that "bad faith failure to collect potentially exculpatory evidence would violate the due process clause"].)

Here, even if the unrecorded interviews could qualify as destroyed evidence, the record does not reflect any bad faith. Gillis testified that the Department had no policy on recording witness interviews. (Cf. *Duff*, *supra*, 58 Cal.4th at p. 550 ["A showing that evidence was disposed of in accordance with standard procedures in the ordinary course of business suggests police acted in good faith"]; *People v. Tafoya* (2007) 42 Cal.4th 147, 187 [same].) She explained that she simply chose not to record the interviews in question. The trial court found Gillis credible, and we defer to this finding. (*Fultz*, *supra*, 69

21

Cal.App.5th at p. 429.)  The court further found no evidence of "malfeasance" nor any "deliberate attempt to undermine the defense."  These findings are supported by substantial evidence. Gillis's practices "may have been negligent, but negligence does not establish constitutional bad faith." (*Flores*, *supra*, 9 Cal.5th at p. 397 [no bad faith where detective had no reason to believe that wiping down handgun might destroy potentially exculpatory evidence].)

Recalde argues that Gillis's explanation for her decision to record some interviews, but not others, supports his claim that she acted in bad faith.  We disagree.  Gillis testified that she chose not to record her interviews with the victims because they are subject to subpoena. (See, e.g., §§ 1326, 1328.)  Recalde asserts this explanation does not "hold water" because "not all victims are subpoenaed to testify" and there is no evidence that Elena was subpoenaed in this case.  However, that the victim in this case ultimately chose to testify of her own volition does not contradict the rationale Gillis articulated.  Gillis also provided a reasoned explanation for her decision to record her interviews with Recalde's children.  She testified that close family members who live with a defendant are more likely to recant inculpatory pretrial statements, particularly if their safety is at risk, suggesting it is particularly important to preserve their pretrial statements.  Recalde argues this belief was unfounded because Recalde's children did not provide any inculpatory evidence and did not face any safety risk.  But the fact that the family members in this specific case did not ultimately recant or face a safety risk does not contradict Gillis's belief that close family members are more likely to do so in general.  Overall, Gillis's explanations are reasonable.  Indeed, even if they were not

22

perfectly logical, Recalde fails to provide any legal authority or reasoned argument supporting that mere irrationality equates to bad faith.[9]

Even assuming Recalde could meet the first prong of *Trombetta/Youngblood*, the absence of pretrial interview recordings did not deny Recalde the opportunity "to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S. at p. 489.) Recalde cross-examined both victims and several of their immediate family members whose pretrial interviews were not recorded. He also impeached both victims with their testimony from the preliminary hearing. Indeed, Recalde was acquitted on the charge relating to Madison, suggesting his trial counsel was able to effectively discredit her even without a pretrial interview.

Finally, Recalde's reliance on *Fultz*, *supra*, 69 Cal.App.5th 395 for the proposition that failure to record a witness interview constitutes a *Trombetta/Youngblood* violation is misplaced. In *Fultz*, the prosecution interviewed two codefendants who had accepted plea deals. (*Fultz,* at p. 405.) The interviews were conducted in a room in which video recording equipment "continuously records." (*Ibid*.) However, "somebody had altered the recording equipment and muted the audio recording feature." (*Id*. at p. 406.) The trial court found that the equipment was

---

[9]     The speculative exculpatory nature of the unrecorded statements further undermines any claim of bad faith by Gillis. (See *Montes*, *supra*, 58 Cal.4th at 838 ["Because '[t]he presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed' [(*Youngblood*, *supra*, 488 U.S. at p. 57)], defendant has failed to establish bad faith in this case."].)

altered in bad faith, thus violating the defendant's due process rights. This violation, when combined with eight other constitutional and discovery violations, warranted dismissal. (*Id.* at pp. 413–414.) The Court of Appeal concluded that substantial evidence supported the trial court's finding that the government unconstitutionally muted the interviews. (*Id.* at p. 429.)

The facts of the instant case are distinguishable from those in *Fultz*. Unlike in *Fultz*, none of the unrecorded witness interviews in this case were conducted in rooms set up to automatically record, and there was no evidence that Gillis or anyone else ever bypassed any default recording function.[10] Gillis explained that she simply chose not to record the interviews, and the court found her credible. Moreover, in *Fultz*, the trial court found that someone had muted the recording equipment in bad faith. (*Fultz*, *supra*, 69 Cal.App.5th at pp. 429–430.) In contrast, the trial court found Gillis credible and found no evidence of "malfeasance." As we have discussed, we defer to these findings, as they are based on substantial evidence, and there is no evidence that Gillis or anyone else acted in bad faith. We therefore reject Recalde's arguments under *Trombetta* and *Youngblood*.

In the alternative, Recalde claims his counsel was ineffective for failing to specifically cite *Trombetta* and *Youngblood* in the trial court. To establish this claim, Recalde

---

[10] The two devices that could have recorded Recalde's polygraph examination failed to do so, but the only evidence on that issue indicated these failures were the result of technical malfunctions, not bad faith. In any case, Recalde's *Trombetta/Youngblood* argument is based solely on the unrecorded witness interviews, not Recalde's unrecorded polygraph examination.

24

must show (1) his counsel's representation fell below the standard of reasonableness "under prevailing professional norms," and (2) that deficient performance caused him prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*); *People v. Tilley* (2023) 92 Cal.App.5th 772, 778 (*Tilley*).)  Recalde has failed to make either showing.

Recalde has not demonstrated the absence of any " 'satisfactory explanation' " for counsel's failure to raise an argument under *Trombetta* or *Youngblood*.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)  For example, his counsel may have concluded that the due process arguments raised in his motion to dismiss would be the most persuasive theories under the facts of the case.  "[W]e have no basis upon which to conclude that defense counsel failed to pursue a reasonable tactical choice" by focusing on certain due process arguments instead of barraging the trial court with every conceivable claim.  (*Id.* at p. 747.)

Even if we could conclude that defense counsel's approach fell below applicable professional standards, Recalde has nonetheless failed to establish prejudice.  "It is not enough to establish prejudice for defendant to propose that counsel's performance had some 'conceivable effect' on the outcome; rather, defendant must show a reasonable probability of a *different* result but for counsel's errors.  [(*Strickland, supra,* 466 U.S. at pp. 693–694.)]  Prejudice must be a demonstrable reality established based on facts in the record, not simply speculation as to the effect of the errors or omissions of counsel. [Citations.]" (*Tilley, supra,* 92 Cal.App.5th at p. 778.)

Recalde's appellate briefing fails to identify any prejudice that resulted from his counsel's failure.  In any case, as we have discussed, Recalde's counsel raised several arguments relating to

the People's treatment of evidence, including a motion to dismiss based on a due process violation.  The trial court denied that motion, found Gillis credible, and generally found that law enforcement did not engage in any "malfeasance."  Thus, even if Recalde's counsel had explicitly raised a *Trombetta/Youngblood* argument below, there is no reasonable probability that the court would have concluded Gillis's decision to not record the interviews violated either standard.

The record does not " ' "affirmatively disclose the lack of a rational tactical purpose" ' " for counsel's conduct (*People v. Majors* (1998) 18 Cal.4th 385, 403), and even it had, Recalde cannot establish prejudice.  We therefore reject Recalde's claim of ineffective assistance of counsel.

## II. Recalde Has Not Established That His Absence From The Trial Testimony Readback Caused Prejudice

After the jury began deliberating, it requested readback of the testimony of Recalde, Elena, and Madison.  The court indicated it would instruct the court reporter to read back that testimony in the jury room.  Defense counsel objected, and asserted Recalde had a constitutional right to be present during the readback.  The court rejected this request, citing *People v. Covarrubias* (2016) 1 Cal.5th 838 (*Covarrubias*), in which our high court concluded that " 'the rereading of testimony is not considered a critical stage of trial in which the defendant has a constitutional right to personal presence.' " (*Id*. at p. 917.)

On appeal, Recalde attempts to revive this constitutional argument, but he fails to address *Covarrubias*.  To the extent Recalde means to argue that *Covarrubias* was wrongly decided, such an argument "is not productive in a trial court.  Or here." (*Olson v. Lyft, Inc.* (2020) 56 Cal.App.5th 862, 866, fn. 1.)  Indeed,

26

" '[o]n federal questions, intermediate appellate courts in California must follow the decisions of the California Supreme Court, unless the United States Supreme Court has decided the *same* question differently.' " (*Id*. at p. 870.) Recalde has not identified any authority from the California or United States Supreme Court that supersedes or contradicts *Covarrubias*. "In any event, '[a]bsent a showing of prejudice, a defendant's "absence from a rereading of testimony does not raise due process concerns." ' " (*Covarrubias*, *supra*, 1 Cal.5th at p. 918.) Recalde argues that the court reporter might have read the transcripts back incorrectly or unfairly emphasized certain testimony, but these contentions are speculative and must be rejected. (*Ibid*. ["Defendant's suggestion that the reporter may have given undue emphasis to certain portions of the transcript (e.g., by emphasis of voice) or read from the wrong transcript, or that a portion of the testimony may have been inadvertently omitted is entirely speculative."].)

Recalde also argues, and the People concede, that the court committed *statutory* error by allowing the jury to hear certain testimony read back outside of Recalde's presence and over his counsel's objection. Recalde cites section 977, subdivision (b)(1), which requires that a defendant in a felony proceeding "shall be physically present . . . during those portions of the trial when evidence is taken before the trier of fact," and "shall be physically or remotely present at all other proceedings unless they waive their right to be physically or remotely present, with leave of court and with approval by defendant's counsel." However, such error " ' "is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error." ' " (*People v. Avila* (2006) 38 Cal.4th 491, 598.) Recalde's

27

speculative arguments are again insufficient to establish prejudice. "Because defendant provides no basis on which we could conclude the result of his trial would have been different had he been present at the readback (citation), we find the violation of section 977 was harmless." (*Ibid*.)

## III. Recalde Has Not Identified Any Prejudice Based on The Amended Information

Recalde claims the trial court erred by allowing the prosecution to amend the information just before jury selection to add four allegations of factors in aggravation, over his counsel's objection. We disagree.

An information may be amended "without leave of court at any time before the defendant pleads or a demurrer to the original pleading is sustained." (§ 1009.) "If there is no prejudice, an amendment may be granted 'up to and including the close of the trial.' " (*People v. Goolsby* (2015) 62 Cal.4th 360, 367–368.)

Here, the amendment added allegations that the victims were particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)), that Recalde took advantage of a position of trust (*id*., rule 4.421(a)(11)), and that the crimes alleged involved separate acts of violence and were committed at different times and separate places (*id*., rule 4.425(a)(2) & (3)). The first two allegations arise from the same facts underlying the crimes alleged in the original information, i.e., that Recalde molested two young girls who were friends with his daughter. The latter two allegations are consistent with the original information, which alleged that Recalde committed multiple lewd acts during different timeframes. The new allegations did not constitute a " 'significant variance' " in the case against Recalde, and

28

therefore the amendment was permissible. (*People v. Mora-Duran* (2020) 45 Cal.App.5th 589, 599; *People v. Murphy* (1973) 35 Cal.App.3d 905, 923 [amendment "arising out of the same transactions as those originally charged" was not prejudicial].)

Recalde claims the amendment caused prejudice because it "cannot be known" whether his counsel would have prepared his defense differently if the new allegations were included in the original information. We reject this facially speculative argument as insufficient to establish prejudice, and therefore we find no error.

## IV. Recalde is Entitled to Three Days of Additional Custody Credits

The parties agree that the trial court erroneously found that Recalde was entitled to 1,542 days of presentence credits for actual time served. Recalde claims he served three additional days, while the People argue he is entitled to two more days.

Recalde was arrested on November 2, 2018, and remained in custody until his sentencing on January 24, 2023. " 'A defendant is entitled to actual custody credit for 'all days in custody' in county jail and residential treatment facilities, including partial days.' " (*People v. Valdes* (2020) 53 Cal.App.5th 953, 955.) Recalde was in custody for 60 days in 2018, including the day of his arrest; 365 days in 2019; 366 days in 2020, a leap year; 365 days in 2021; 365 days in 2022; and 24 days in 2023, including the day on which he was sentenced. He was therefore in custody for a total of 1,545 days. The court found Recalde was entitled to an additional 231 days for worktime credits, resulting in a total of 1,776 days of presentence credits. We remand and instruct the trial court to correct the abstract of judgment accordingly.

29

## V. The Trial Court Did Not Abuse Its Discretion in Awarding Restitution

Finally, Recalde argues the trial court abused its discretion in ordering restitution for Elena's future mental health treatments and her family's moving costs. We find no abuse of discretion.

### a. Additional factual background

After Recalde was convicted, Elena's family sought restitution for 10 years of future bimonthly counseling for Elena at $150 per session. The family also requested $55,250 in economic losses incurred when they moved away from Recalde's house.

At the restitution hearing, Elena's father, Richard H., testified that Elena participated in counseling for two years before trial, but ultimately grew "tired of going to it." She started attending counseling again sometime after trial and was continuing to participate as of the restitution hearing. Her counseling program cost $150 per hour. Richard testified that 10 years of future counseling was needed, but conceded this was speculative. The court reasoned it would be inappropriate to award restitution based on pure speculation. However, the court found Elena's successful participation in two years of counseling before trial was "a bench-mark" for her future needs, and the court therefore awarded $7,200 to cover bimonthly counseling for two years at $150 per session.

As for the moving costs, Richard testified that the family decided to move because "Elena had to see the room where she was molested in every time we drove up to the driveway." Elena's therapist told the family that they needed to move because "it's not healthy for her to see that house every day . . . ."

Elena's parents' therapist also told the family that they needed to move. The family submitted a letter from Debora Rocha, the executive director of Elena's therapy program, in support of their need to move. The court reasoned the letter was important to fulfill the requirements in section 1202.4, subdivision (f)(3)(I), which provides that restitution for expenses incurred for "relocating away from the defendant" must be "verified . . . by a mental health treatment provider to be necessary for the emotional well-being of the victim."

Recalde objected to the letter as lacking adequate foundation.[11] The court recognized that the letter may have "foundational issues" insofar as it was written by the executive director, who may not have had direct contact with Elena. However, the court allowed the People to establish a foundation at a future hearing. The People later submitted a letter from Elena's parents' therapist, which, according to defense counsel, indicated the parents "felt scared and uncomfortable" but did not indicate that the therapist recommended moving. The prosecution urged the court to consider the evidence as a whole, and the court found that the two letters, together, were sufficient to meet the requirements of section 1202.4, subdivision (f)(3)(I). The court therefore determined Elena's family was entitled to restitution for relocation costs.

After Elena's family listed their house for sale, someone told them that they were required to fill out a "Megan's Law Database Disclosure" informing potential buyers that their neighbor was in jail awaiting trial for molestation. Richard knew

---

[11] The court overruled the defense's hearsay objection. Recalde does not argue on appeal that this was error.

that Megan's Law applies to convicted sex offenders and that Recalde was not yet convicted when they listed the house for sale. However, he nonetheless believed "everyone has to fill one out." The family also disclosed that there was a crack in the foundation of the house. Two families made offers to purchase the house but ultimately backed out because they did not want to live next to a potential child molester. The difference between the highest offer on the house and the eventual sale price was $24,000. The family also incurred $31,250 in closing costs. The court found that Elena's family incurred an economic loss of $55,250 resulting from Recalde's crimes.

Elena's family purchased their former home for $418,000. They purchased a new home for $825,000, which was worth around $900,000 or $1 million at the time of the restitution hearing. The trial court rejected Recalde's argument that these facts indicated that restitution for moving expenses would result in an unfair windfall.

### b. *Legal framework and standard of review*

"It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) Therefore, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order . . . ." (*Id.*, subd. (f).) This amount shall be "sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (*Id.*, subd. (f)(3).) Such losses include, but are not limited to, mental health counseling

expenses and "[e]xpenses incurred by an adult victim in relocating away from the defendant" which are "verified by law enforcement to be necessary for the personal safety of the victim or by a mental health treatment provider to be necessary for the emotional well-being of the victim." (*Id.*, subd. (f)(3)(C) & (I).) Restitution may include expenses for future mental health counseling. (*People v. Giordano* (2007) 42 Cal.4th 644, 657–658 (*Giordano*).)

"For purposes of [section 1202.4], 'victim' shall include . . . [¶] (1) The immediate surviving family of the actual victim" and any "person who has sustained economic loss as the result of a crime and who . . . [¶] (A) At the time of the crime was the parent . . . of the victim." (§ 1202.4, subd. (k); Cal. Const. art. I, § 28 [the term " 'victim' " includes the person who suffered harm as well as their parents].) Thus, Elena and her parents were victims.

"The standard of proof at a restitution hearing is preponderance of the evidence. [Citation.] A victim's statement of economic loss is prima facie evidence of loss. [Citation.] To rebut a prima facie case, the defendant has the burden to disprove the amount of losses the victim claimed." (*People v. Grandpierre* (2021) 66 Cal.App.5th 111, 115 (*Grandpierre*).)

We review the court's restitution order for abuse of discretion. (*Giordano, supra,* 42 Cal.4th at p. 663.) " 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact." (*People v. Baker* (2005) 126 Cal.App.4th 463, 469 (*Baker*).) "No abuse of discretion will be

33

found where there is a rational and factual basis for the amount of restitution ordered." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542 (*Gemelli*).)

### c. *The court did not abuse its discretion in awarding restitution for future mental health treatment*

Recalde does not dispute that the trial court may order restitution to compensate for future mental health counseling expenses. (§ 1202.4, subd. (f)(3)(C); *Giordano*, *supra*, 42 Cal.4th at pp. 657–658.) However, he argues the trial court abused its discretion by awarding restitution for such expenses because Elena's need for future counseling is speculative. We disagree.

The trial court recognized that Elena had completed two years of counseling before trial, and found that this represented "a bench-mark for the post-trial counseling." The court therefore awarded restitution for two years of future counseling costs. This decision was supported by substantial evidence—specifically, Richard's testimony that Elena had completed two years of counseling initially before growing tired of it, which the court viewed as representative of her expected future needs and abilities. The court's ruling has "a rational and factual basis," and therefore the court did not abuse its discretion. (*Gemelli*, *supra*, 161 Cal.App.4th at p. 1542.)

Recalde repeatedly argues that the evidence showed Elena "did not want further therapy" or "was burnt out on therapy." This claim mischaracterizes the record. Although Elena chose to stop using counseling services sometime before trial, Richard testified that she was actively attending counseling at the time of the restitution hearing. Recalde also observes that the prosecution "offered no mental health expert evidence" supporting Elena's need for future counseling. Recalde cites a

34

single opinion which stated, in dicta, that a jury may consider expert evidence in determining what restitution to award for future medical expenses. (*People v. Phelps* (1996) 41 Cal.App.4th 946, 952.)  To the extent Recalde means to argue that the evidence here was legally insufficient for lack of an expert, he has not identified any legal authority supporting this contention, and therefore we reject it.

### d. *The court did not abuse its discretion in ordering restitution for relocation costs*

Recalde also claims the court erred in finding section 1202.4, subdivision (f)(3)(I) was satisfied.  We find no abuse of discretion.

Section 1202.4, subdivision (f)(3)(I) requires that relocation expenses must be "verified by . . . a mental health treatment provider to be necessary for the emotional well-being of the victim."  To meet this requirement, Elena's family submitted a letter from the executive director of Elena's therapy program supporting the need to move.  Recalde objected to the letter as lacking foundation but did not dispute that the letter otherwise satisfied the verification requirement.[12]  The trial court

---

[12]     Recalde's trial counsel specifically argued that the letter did not clarify the author's "qualifications" or "credentials."  On appeal, Recalde does not appear to raise any such argument.  In any case, the statute merely requires verification from a "mental health treatment provider." (§ 1202.4, subd. (f)(3)(I).)  It does not require the provider to have any specific degree or certification.  The court ultimately found that the letter was "from the mental health provider," and there is no dispute that the letter was from the executive director of Elena's program.  Thus, even if Recalde had revived this particular argument on appeal, we would reject it.

tentatively agreed the letter had "foundational issues" because it was unclear whether the executive director interacted directly with Elena.  However, the court later admitted the letter into evidence, and described it as being "from the mental health provider."  We therefore assume the trial court's initial concerns about the letter's foundation were ultimately ameliorated.  Indeed, even if the letter lacked foundation and was not admissible at trial, the court has " ' " 'virtually unlimited discretion as to the kind of information they can consider and the source . . . [from] whence it comes' " ' " in ordering restitution. (*People v. Prosser* (2007) 157 Cal.App.4th 682, 692.)

The family also provided a second letter that independently fulfills the verification requirement.  This letter was from Elena's parents' therapist, and it asserted the parents were scared and uncomfortable about continuing to live next to Recalde's house. Recalde argues that the second letter was insufficient because it did not expressly state that relocation was necessary for the parents' emotional well-being.  Yet, the statute does not require that a verification letter include any such magic words.  Indeed, in *People v. Mearns* (2002) 97 Cal.App.4th 493 (*Mearns*), the court found that similarly vague language was adequate.  There, a detective provided a letter stating:  " 'The victim is suffering emotional stress as a result of the assault.  She is in constant fear of being assaulted again.  She has made statements to the effect that she is unable to live a normal life and that she is in fear of her son's safety.' "  (*Id*. at p. 497.)  The letter did not assert that relocation was necessary for the victim's personal safety. (§ 1202.4, subd. (f)(3)(I).)  Nonetheless, the trial court found the verification sufficient.  (*Mearns*, at pp. 501–503.)

Similarly, here, the letter from Elena's parents' therapist stated the family felt scared and uncomfortable living next to Recalde's home. Another court may have found this insufficient to convey that the family needed to move to preserve Elena's mental health or that of her parents, but we cannot find an abuse of discretion merely because a different result could also be supported by the evidence. (*Baker*, *supra*, 126 Cal.App.4th at p. 469.)

Finally, to the extent there was any ambiguity in either letter, other evidence supported the family's need to move. Richard testified that both Elena's counselor and the parents' therapist said the family needed to move because it was unhealthy for Elena to see Recalde's house every day. This testimony further supports the trial court ruling. (*Grandpierre*, *supra*, 66 Cal.App.5th at p. 115.)

Overall, " 'the circumstances reasonably justify the [trial court's] findings,' " and therefore the court did not abuse its discretion. (*Baker*, *supra*, 126 Cal.App.4th at p. 469.)

### e. The court did not abuse its discretion in calculating the proper amount of relocation costs

Recalde also argues that the court abused its discretion in determining the amount of relocation costs incurred by Elena's family. We again find no abuse of discretion.

The trial court was required to award restitution for every determined economic loss resulting from Recalde's conduct. (§ 1202.4, subd. (f)(3).) As we have discussed, the trial court determined that the family needed to move as a result of Recalde's crimes. Richard testified that the family incurred $31,250 in closing costs. He further testified that two potential buyers withdrew their offers based solely on the disclosure that

the home was next to that of an accused sex offender.  The eventual sale price of the home was $24,000 lower than the highest offer.  The trial court determined that the closing costs and the diminished price were economic losses resulting from Recalde's crime.  This ruling is supported by the evidence, and it is rationally and factually sound.  (*Gemelli*, *supra*, 161 Cal.App.4th at p. 1542; cf. *Mearns*, *supra*, 97 Cal.App.4th at pp. 501–503 [no abuse of discretion in awarding restitution for difference between sale price of sexual assault victim's mobile home and purchase price of new mobile home].)

Recalde argues the trial court only speculated that his crime caused the diminished sale price.  He notes that Elena's family also disclosed that there was a crack in the foundation, which may have also caused the two potential buyers to withdraw, and he claims there was "zero evidence" that the buyers withdrew based on Recalde's actions.  Yet, Richard expressly testified that two buyers backed out solely because of the disclosure that a neighbor was an accused sex offender.  This testimony is prima facie evidence that the price reduction was caused by the disclosure of Recalde's actions.  (*Grandpierre*, *supra*, 66 Cal.App.5th at p. 115.)

Recalde also argues that Elena's family was not required to disclose to potential buyers that Recalde was an accused sex offender.[13]  But even assuming this disclosure was not legally

---

[13]    Recalde cites section 290.46, which requires the California Department of Justice to publicly disclose information about certain categories of registered sex offenders, but has no apparent bearing on disclosures in real estate transactions.  While Civil Code section 2079.10a, subdivision (a)(3) requires that contracts for the sale of residential property disclose the existence of the

required, there can be no real dispute that the disclosure was ultimately the "result of the defendant's conduct . . . ." (§ 1202.4, subd. (f).) But for Recalde's crimes, Elena's family certainly would not have disclosed such obviously negative information to potential buyers. Perhaps a different trial court might have found that Richard's misunderstanding contributed to the price reduction, and thus reduced or excluded the reduction from the restitution order. But we cannot say that the trial court abused its discretion simply because the facts could support a different result. (*Baker*, *supra*, 126 Cal.App.4th at p. 469.)

Finally, Recalde argues the restitution award provided Elena's family with an improper windfall. He notes that the family purchased their former home for $418,000 and sold it for $625,000; and that the value of their new home had increased by between $75,000 and $175,000 at the time of the restitution hearing. However, the fundamental question for the trial court was what "economic loss incurred as the result of [Recalde's] criminal conduct . . . ." (§1202.4, subd. (f)(3).) The natural economic appreciation of the family's real estate was not an economic loss, nor was it caused by Recalde's crime. Recalde fails to cite any legal authority or provide any reasoned argument explaining why the court was required to consider this factor.

Recalde contends *People v. Chappelone* (2010) 183 Cal.App.4th 1159 (*Chappelone*) is "instructive" because it

---

website maintained pursuant to section 290.46, it does not mandate other disclosures related to accused or convicted sex offenders. Although sellers are subject to a variety of common law and statutory duties to disclose information regarding a property, the People have not argued Elena's family was required by law to make disclosures about Recalde.

cautions against restitution awards that constitute a windfall. In *Chappelone*, the trial court ordered the defendant to return stolen retail merchandise and compensate the retailer for its full retail price. (*Id*. at p. 1180.) The appellate court reversed, concluding the award was a windfall because it double-compensated the retailer. (*Id*. at p. 1181.) Yet, here, nothing in the court's restitution award can be understood as double-compensating Elena's family. Recalde repeatedly claims that the family received a windfall based on the increased value of their real estate, but he otherwise fails to apply *Chappelone* to the facts of this case.

However, one aspect of *Chappelone* is illuminating. There, the court reasoned that one aspect of an appropriate restitution award might require the defendant to compensate the retailer for the "diminution in value" that resulted from the crime. (*Chappelone, supra*, 183 Cal.App.4th at p. 1181.) That is essentially what the trial court did here. The first potential buyer offered Elena's family $649,000, representing the initial value of the house. That potential buyer and one other withdrew offers because the home was next to that of an accused sex offender. The eventual sale price, accounting for that negative circumstance, was $625,000. In short, the home's value diminished by $24,000 because of Recalde's crime, and the trial court awarded restitution for that diminution. In this respect, *Chappelone* supports, rather than contradicts, the restitution order. The trial court did not abuse its discretion.

40

## DISPOSITION

The judgment and the restitution order are affirmed. The trial court is directed to amend the abstract of judgment to correct the "actual" credits for time served for custody credits to 1,545 days, and to correct the "total credits" for time served to 1,776 days. The trial court is further directed to send certified copies of the amended abstract of judgment to the Department of Corrections and Rehabilitation and to appellate counsel.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

BERSHON, J.[*]

We concur:

EDMON, P. J.

ADAMS, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.